## John Duncan v. Aylett B. Rawls.

Where an heir, especially after so great a lapse of time (fourteen years), sues for the share of a deceased partner in the community, the fact of indebtedness of the community, if relied upon, must be established by the defence.

It is not necessary to consider what equities might be set up by a surviving husband, or his vendees, against the claim by the heirs of a deceased wife, for her share in the community; as, for instance, that the property is subject to, or has been disposed of in payment of debts; or that there is other property of the community sufficient to satisfy the claim.

Whatever may be the construction, under the Codes of Louisiana, as to the universal operation of prescription against vacant estates, including minors as well as adult heirs, yet it would seem that by the laws of Spain, at least in the opinion of Escriche, there would be an exception in favor of minority.

But, if it be admitted that no such exception exists, and that by the legitimate operation of Spanish law, minor as well as adult heirs were excluded, as against third possessors, provided they did not accept the estate within a limited period; yet we are of opinion that this doctrine does not have, nor can it be allowed, any such operation, under our laws and their construction and the established usages and practice in relation to the estates of deceased persons, as would materially benefit the defendant or preclude the plaintiff from his action.

It is doubtful whether, within the scope and meaning of the terms in Spanish law, there was any such thing as the vacant estate of the civil law known to our jurisprudence after December, 1836.

But, whatever may have been the law in relation to vacant estates, and the prescription for and against them, we believe this to have been abrogated on the introduction of the Common Law, in 1840, and other laws passed during that session.

If then the estate of Milly, the mother, (died in 1833) was vacant, and if prescription did run against a minor heir of such estate, as is contended by appellant—but which, to say the least, on a true construction of the law of the Partidas, is very doubtful; yet, by operation of the laws in 1840, the estate must be regarded as vesting in the heir, without any express, formal or tacit acceptance; and if so, the defendant cannot claim the benefit of prescription, as sufficient time had not elapsed to complete the bar.

As to whether the time which ran under the laws of Spain, could be computed and estimated as a part of the two years allowed a minor after age, under the law of 1836, to bring his suit, we are of opinion that it cannot be considered in the estimate.

Husband and wife married in 1823; headright granted in 1824; son born in Texas December 24th, same year; wife died in 1833, leaving a son and an infant daughter; daughter died at the age of six months; husband sold the land in 1835 to the defendant, who took possession same year, and continued to possess it as his own property, paying taxes thereon, until commencement of suit by son, December 9th, 1847: Held that the son was entitled to recover one quarter of the land as heir of the deceased wife.

Appeal from Matagorda.   Tried before the Hon. C. W. Buckley.

Suit by appellee against appellant, to recover one half of a league and a quarter of land, granted to Daniel Rawls, as his headright.   The only important facts in the case, aside from the question of improvements, (which was decided in favor of appellant, from which decision there was no appeal,) were as follows: Daniel Rawls and Milly Kincheloe were married in Louisiana on the 23rd day of October, 1823 ; the land was granted to Rawls on the 24th day of July, 1824 ; the plaintiff was born on the 24th day of December, 1824, in Austin's Colony ; Milly Rawls died in the summer of 1833, leaving the plaintiff and an infant daughter ; the daughter died at the age of six months.   This suit was commenced on the 9th of December, 1847 ; the defendant pleaded the Statute of Limitations and prescription ; it appeared that the defendant purchased the land from Rawls in the Fall of 1835, and same year took possession and continued to possess the same as his own, paying taxes thereon until the commencement of this suit.

The petition alleged all of the above facts, which were favorable to the plaintiff ; alleged that he was the only heir ; and alleged there had been no administration on the wife's estate.   A demurrer to the petition was overruled ; jury waived ; and Court gave judgment in favor of the plaintiff for one quarter of the land, and the defendant appealed.

*James Denison*, for appellant.   I. The Court below erred in overruling the defendant's demurrer.   The grounds of demurrer relied on, were the doctrines laid down in the

decisions of Louisiana upon the subject of community property. These decisions all concur in the principle, "That the heir of the deceased wife who claims one half of the community property *in the hands of a purchaser from the husband,* must first show that the community has made acquests and gains ; which can be established only by a regular settlement of the community ; the community is really only what is left after the payment of debt." (Fortier v. Slidell, 7 Rob. R. 404 ; Lausson v. Ripley, 17 La. R. 247 ; Adams v. his Creditors, 14 La. R. 459 ; 7 La. R. 296. See also Texas law of Marital Rights, Hart. Dig. p. 735, Art. 2412.)

II. The Court below erred in rendering judgment for the plaintiff. The law and the evidence required that the judgment should have been rendered in favor of defendant.

By the laws in force at the time of the death of Milly, and at the time of the sale to Duncan, the estate of Milly would be held to be a vacant estate, (*hereditas jacens,*) until the commencement of this suit ; that being the first and only act of acceptance on the part of the heir ; and a purchaser in good faith from the surviving husband would be protected by the prescription of ten years, although Milly's heirs were minors. (Poultney's heirs v. Cecil's Ex'ors. 8 La. R. 411—415 ; Davis' heirs v. Elkins, 9 La. R. 135 ; Calvit v. Mulhollan, 12 Rob. R. 258 ; McCullough v. Minor 2 Annual R. 468 ; Tison v. Britton, 6 Tex. R. 222 ; Institutes of Justinian, Lib. 2, Tit. 14, Law 2, Cooper p. 132.)

The following principles may be drawn from the above cases :

1st. That under the Roman law, the Spanish law, and the Codes of Louisiana, a vacant succession is one which is not claimed by any one as heir, or by any other title, whether it be represented by a curator or not.

2nd. That a vacant succession is an incorporeal being, representing the deceased and not the heir.

3rd. That before acceptance the heir is a stranger to the

succession, and that his rights to the property of the succession are not vested until acceptance.

4th. That prescription runs in favor of a purchaser in good faith, against such succession. (Code of 1808, p. 160, Art. 71 ; Id. p. 162, Art. 74 ; Id. p. 486, Art. 62 ; Code of 1825, Art. 934, 936, 970, 940, 1088 and 3492.)

As the above cited cases in Louisiana do not refer to the Roman and Spanish law by particular citations, it may be useful to examine into those laws.

See Justinian's Institutes, Lib. 2, Tit. 14, Law 2, in which is the following : " *Nondem adita hæreditas, personæ vicem susti-net non hæredis futuri, sed defuncti ;*" rendered by Cooper— " For an inheritance, not yet entered on, represents the person of the deceased, not of the future heir."

See, also, Dig. L. 41, T. 1, L. 34, which is in these words : "*Hereditas enim non hæredis personam sed defuncti sustinet, ut multis argumentis Juris Civilis comprobatum est,*" which I assume to translate—" The vacant succession does not represent the person of the heir, but that of the deceased, as is shown by many texts of the Civil Law." (See Dig. Lib. 1, T. 8, L. 1; Dig. Lib. 28, T. 5, L. 31, § 1 ; Mackelday, § 685 C.; Domat, *Lois Civiles*, L. 1, T. 1, ¶1, Nos. 14 and 15.

And in France it was held, before the introduction of the Code Napoleon, that prescription run for and against vacant successions, whether they were provided with curators or not. (Pothier on Oblig. No. 648, also part 3, Chap. 8, Art. 2, § 2 ; Merlin's Rep. vo. Prescription, Sec. 1, § VI. Art. II., q. XVI. By reference to Merlin's Rep. vo. Succession Vacante, Sec. 1 § VI, Art. I, q. XVI, to Troplong, Prescription, No. 805, and to Vazable, Prescription, No. 307, it will be seen the enactments of the Code Napoleon and the Codes of Louisiana, were not considered as altering, but as re-enacting the provisions of the previously existing law.

It may, however, be said that the foregoing citations are all from the Roman Law, and it may be necessary to give authori-

ties from the Spanish civilians to show that the same principle was incorporated into the Spanish Law.

The Spanish Law was founded upon the Roman Civil Law, and since the 14th century when the Partidas were promulgated, the Spanish Law of jurisprudence has remained unchanged. Like the Common Law of England, it is the growth of ages, and except in commercial matters, was never changed by codification, as was the case in France and Louisiana, or by political events and the substitution of another and different system, as was the case in Missouri and Texas.

The laws of Mexico in force in Texas in 1833 and in 1835, were the laws of Spain, except so far as altered in political matters by the revolution. If, therefore, no change of the Roman Law with reference to vacant estates, the acceptance of heirs and prescriptions, can be shown in Partidas, or some other enactment, it must be presumed that the Spanish Law was the same as the Roman Law in reference to these particulars.

But we are not left to this conjecture solely. The Spanish civilians, or the Spanish commentators upon their own system of jurisprudence, give us ample proof that the Spanish Law was identical with the Roman Law in these respects.

Salgado, Labirenthus Creditorum, Cap. 32, treats at length of vacant successions. It appears that the Spanish Law followed the Roman Law without variation. Thus : in § 3, Salgado says that " a vacant succession is a fictitious person, which represents the deceased as to all legal consequences," and in §4, " while a succession not yet accepted (vacant,) re-" presents the deceased and not the heir, so when once accepted " it represents the heir and not the deceased," and " when the " heir presents himself and accepts the succession, he takes it " in the same condition in which it was before his acceptance," (§40, 41 and 42.)

Gregor ia Lopez in note 2 to the 29th Law, 29th Title, 3rd Partidas, says that during the vacancy of the succession, pre-

scription is continued even without possession. This is also said in Gomez's Commentaries *Ad Legem XLV. Tauri*, 112.

Assuming that the proposition with which this portion of my argument commences has been sustained, i. e.: That by the laws in force at the time of the death of Milly, and at the time of the sales to Dinsmore and to Duncan, the estate of Milly would be held to be vacant until the institution of this suit, and that a purchaser in good faith of community property from the surviving husband would be protected by prescription, it seems now proper to examine into the laws of Texas as to their effect upon the title by prescription claimed in this case by the appellant.

The first law passed by the authorities of Texas after the separation from Mexico, which in any way touches the matter, is the law of the Consultation, passed Jan. 22, 1836. (Hart. Dig. 983, p. 321.) This law enacts "that all proceedings rela- " tive to successions, matters of probate, etc., shall be regulated " and governed agreeably to the principles and laws in similar " cases in Louisiana." There has been some difference of opinion as to the extent of this adoption of the Louisiana Law; but the better and more generally received opinion is, that the enactment adopted the whole mortuary system and laws of that State. This opinion is sustained by many considerations, two of which only I will here mention.

1st. The very terms of the enactment seem to indicate the intention of the Legislature to incorporate the principles of the Louisiana Law into ours, as well as the mode of proceeding; for how could the proceedings be in accordance with the laws and principles, unless those laws and those principles were also adopted. This construction can be avoided only by ad- mitting that the *laws* and *principles* of Louisiana at the time were identical with those in force in Texas, and consequently it was only necessary to adopt their mode of proceeding under those laws.

2nd. Apply the good old rule of construction—that of the

old law, the mischief and the remedy, and all doubt as to the
construction of the Law of the Consultation is at rest. The old
Law was the Spanish Civil Law.  The mischief, that this Law
was concealed in a foreign language and in books inaccessible
to the people.  The remedy, was the introduction of a Law as
nearly similar as possible in our own language, and easily ac-
cessible to all.  The Louisiana Law answered this purpose.  If
nothing but the mode of proceedings—the mere practice, was
introduced, and the Laws and principles left out, the mischief
would have remained, and the remedy been unapplied.

This enactment of the Consultation was saved from the re-
pealing clause of the Statute adopting the Common Law in
1840, and was never repealed until 1846 by the repealing
clause of the Probate Act of that year.

If the law of the Consultation receive this construction, it
must be understood as adopting the Law of Louisiana as it
stood in January, 1836.  The Code of 1825 was then the law
of Louisiana, and this must be judged of and construed by the
decisions in the cases before cited, Elkin's heirs v. Davis', and
M'Cullough v. Minor.  It will also be seen that the Law of
the Consultation continued in force until 1846, in which period
the ten years of peaceable possession in good faith, required by
the Civil Law for prescription upon lands, elapsed.

The next law of Texas which might be construed as touch-
ing the matter, is the Law of December 20th, 1836.  (Hart.
Dig. Art. 2375.)  This Law, upon examination, will be found
to grant a shorter time of prescription, to wit, five years, to a
particular class of occupants, actual settlers and citizens, and
holding under given titles, to wit, color of title duly proven
and recorded in the proper county.  This cannot be construed
as a repeal of the old prescription of ten years in favor of pos-
sessors in good faith, but only as giving a shorter time to those
whose character and mode of holding are in accordance with
the statutes. It certainly does not prevent any one from claim-
ing under the old prescription of ten years, if he chooses to

abandon his claim under this. The law is cumulative in favor of prescription, rather than repealing in its effect.

Nor can the provision in this statute giving to minors two years after majority to commence suit, be construed as affecting the case before us in any way. This provision was intended as a protection to those minors who should have a present, legal, vested title to the property which is the subject of prescription, and not to those who might have the prospect of acquiring an interest by some future contingency or act of their own. This law does not alter the character of vacant successions previously cast. The succession of Milly Rawls, after the passage of this law, as well as before, still retained the character of representing the deceased, and not the future heir. This incorporeal person, the succession, was the only legal owner of the property, both before and after the passage of this law, the future heir, without acceptance, being a stranger to the succession and having no vested interest in its property.

The next enactment of Texas, which might be supposed to affect this matter, is the law of 1840, adopting the Common Law. The adoption of the Common Law can only be construed as affecting successions subsequently accruing, and there cannot be given to it the retrospective effect of striking out of existence legal existences and beings, created by the former law. The succession of Milly Rawles continued to exist after the adoption of the Common Law, as a vacant succession, and so existed up to the commencement of this suit.

And further, the fact that by the express terms of the statute adopting the Common Law, the Acts of the Consultation adopting the Law of Louisiana in reference to successions, were saved from repeal and continued in force, shows plainly that the Legislature did not intend by the adoption of the Common Law, to alter in any way the pre-existing laws of succession, much less to interfere retrospectively with successions previously cast.

As to the Limitation Law of 1841, the same argument may

be urged as that applied to the Law of Dec. 20, 1836, with this addition, that this Act in express terms saves all previous prescriptions acquired or begun to be acquired. (Hart. Dig. Art. 2396.)

But suppose that the above mentioned laws be construed as repealing the former law, and striking out of existence the fictions being mentioned above, still we maintain that according to a correct construction of the law, the full time of prescription had run at the commencement of this suit.

The following proposition has been sanctioned during all time by the civilians, and has in modern time been adopted in the Common Law, and has lately been adopted by the Supreme Court of Texas as the rule of decision. (Goddard's heirs v. Urquhart, 6 La. R. 661 ; Hempi v. Oso, 11 La. R. 57 ; 1 Tex. R. 732 Gautier, v. Franklin.)

"When the law is changed after prescription begins to run, "the time which elapsed under the law preceding the alteration "is to be computed according to that law, and that which fol- "lows is to be reckoned according to the new law, and the time "acquired under the old law is to be added to that acquired "under the new law, in proportion to the time that each time "bears to the time required by the old and new laws."

Take this rule of decision, and admitting that the first mentioned law passed the 20th December, 1836, changed the old law, still under the old law the prescription run from the 22d September, 1835, till the passage of the law of 20th December, 1836, a period of more than one year and two months ; so that more than one tenth of the time required by the old law had elapsed when the new law took effect. Now, what portion of the time required under the new law remained unelapsed at the date of the commencement of this suit.

The evidence will show that plaintiff became of age, at the latest, on the 24th December, 1845, and this suit was commenced the 9th of December, 1847. Now, giving all latitude of calculation, the time unelapsed was only 15 days. The

Statute of 1836 gives to minors two years after majority to commence suit. The 15 days is less than one 48th part of the two years, so that under the old law more than one tenth of the time had elapsed, and under the new law more than forty-seven-forty-eighths had elapsed, which, when added according to the rule, will make more than the whole time required. I beg leave here particularly to refer to the opinion of the Judge in the case of Calvit v. Mulhollan 12 Rob. Rep. 258.

In this case the Judge lays down this rule of computation of time in a case exactly similar to the one under discussion, and so far as regards this portion of the opinion of the Judge, the case stands unimpeached. The over-ruling in the case of M'Cullough v. Minor, having reference to a different opinion expressed in the same case, as has been herein before shown.

The case is still stronger for defendant, if it be alleged that the adoption of the Common Law changed the old law. The Common Law was adopted in 1840, when nearly half of the old prescription had run.

If it be admitted that the old law was changed by the Law of Limitations of 1841, it will be seen that the 15th Section of that Law fixes the time at three years, and that more than one half of the time of the old law had elapsed before the 17th March, 1841, when that Act went into effect, and that more than one half of the three years had elapsed between the time of plaintiff coming to majority and the commencement of suit. See Hart. Dig. Art. 2391.

*J. W. Harris* and *J. B. Jones*, also, for appellant.

*J. H. Bell*, for appellee. It is respectfully submitted to the consideration of this Court, that when it is said in the Roman and Spanish Law and in the Codes of Louisiana, that prescription runs against a vacant estate, it is only meant that prescription runs in favor of persons against whom the estate has some demand, to bar a suit to enforce that demand after the lapse of a certain time. On the other hand, prescription runs

in favor of a vacant estate, to bar a demand against it, because those having demands, of whatsoever nature, against such an estate, might have a curator appointed for the estate, and thus proceed with the administration of it.    It is in this sense only that an estate was ever considered as a fictitious being, representing the former owner of it.

I shall briefly examine some of the authorities quoted by the appellant's counsel, and I shall contrast them with some of the express provisions of the Spanish law, and with other rules which have obtained in the jurisprudence of almost every civilized State, sometimes with little, sometimes with greater modification.

The first case decided in Louisiana in which the doctrine was asserted, was the case of Poultney's heirs v. Cecil's executors, 8 La. R. 411.   The Court decided that limitation ran against the minors, and in favor of the title acquired by the purchasers, *at the sale made by the order of a competent Court.*

The next case is that of Davis' heirs v. Elkins, 9 La. R. 135.   That was a contest between the collateral heirs of a deceased wife and purchasers under her husband, after the lapse of about twenty years.   It was not asserted or proved that the claimants were minors.

But the Court will observe that the Louisiana decisions are not uniform on this question.   On the contrary it is respectfully submitted, that the weight of reasoning and authority is on the side of this question for which I contend.   The case of O. Donald v. Lobdell, 2 La. R., 299, decided by Judge Porter, is to my mind conclusive of this question.   The Judge in that case said that " by the Roman Law and by the Law of Spain, " the acceptance on the part of the heir was necessary to vest " in him a right to interfere with the succession."   He does not say that either by the Roman or Spanish Law, an estate was ever regarded as a fictitious being to all intents and in the sense contended for by the appellant's counsel.   He says, however, that " the Code of 1808 declared that until the ac-

" ceptance or renunciation of the estate by the heir, the inherit-
" ance is regarded as a fictitious being, representing in every
" respect the deceased who was the owner of the estate." The
Judge then proceeds to say, that " the legislation in the Louis-
iana Code (that is, the Code of 1825,) has made a material
change in this part of the law." He says that the jurisconsults
charged with the preparation of that Code, in their report to
the General Assembly, expressly stated, that " they thought it
wise to adopt the rule which vests the right of the heir from
the moment of the death of the deceased." The Judge said
further, " the result of the whole legislation on this subject we
take to be, that the heir may institute suits before he accepts
or rejects the succession ;" and, again—" The law has express-
ly said that the heir represents the succession, and is seized of
it from the moment it is opened." (Calvit v. Mulhollan, 12
Rob. R., 258.) The opinion of the Judge in the case of Calvit
v. Mulhollan, Rob. R., 258, is respectfully insisted upon as
containing an intelligent view of this question. Upon a re-
hearing of that cause the Judge adhered to his former opinion,
and after a full and deliberate investigation of the authorities,
pronounced the arguments employed to sustain the proposition
which is here contended for by the appellant's counsel, specious
but not solid.

The passage cited from the Institutes of Justinian, Book 2,
Title 14, Law 2, found on the 132d page of Cooper, amounts
to nothing as an authority to support the proposition assumed
by the appellant's counsel. When reviewed in connection
with the context and with the foregoing section of the same
title, it will be seen that " an inheritance not yet entered upon,
represents the person of the deceased and not of the future
heir" only for a practical purpose, so far as we can learn from
the passage in question, and that purpose is to enlarge the ca-
pacity of a particular class of persons to take estates when
testaments have been made in their favor. But nothing could
more clearly demonstrate the folly of an indiscriminate appli-

cation of the mere *rules* of the Civil Law to cases arising here, than to invoke any part of this title of Justinian as authority in our Courts.

Again, the passage quoted by the appellant's counsel from the Digest, Book 41, Title 1, Law 34, does not at all help out his argument : "Hereditas enim non hoeredis personam, sed defuncti sustinet, ut multis argumentis juris civilis comprobatum est."

Mr. Denison assumes to translate this passage as follows : "The *vacant* succession does not represent the person of the "heir but that of the deceased, as is shown by many texts of "the Civil Law." The Court will perceive that the text does not refer to a vacant succession or to an inheritance unclaimed, but on the contrary, by necessary implication, the reference is to an inheritance to which there is a known heir. But I do not consider the passage of sufficient importance to justify me in quarreling with the gentleman's translation. The passage only asserts a principle of the Roman Law—and the same is the law of our land to-day, and of every country where rights are protected by laws. The passage does not say that an estate, in the condition in which we find the estate of Milly Kincheloe, was to be regarded as a fictitious being in any sense, much less in the sense contended for by the appellant's counsel. Nor can it be said that the doctrine asserted in this case by the appellant's counsel results, by necessary deduction, from this text of the Civil Law, because the same law says again and again that minors shall not be barred from asserting their right to the property of their ancestors.

In the passages quoted by Mr. Denison from Pothier on Obligations, and from Salgado, those authors speak only of obligations and demands, and treat of estates only in view of the rights of creditors and the obligations and liabilities of debtors. These passages, therefore, cannot be called in aid of the other side. It is true that Pothier says that prescription runs against a vacant estate ; and he gives the reason why it so runs,

because, he says, the creditors of the estate might have a cura-
tor appointed to take charge of it, against whom they could
proceed and collect their debts.

Mr. Denison also quotes Troplong on Prescription, but the
reference is as unfortunate as any he has made.  That writer
says just what is said by Pothier, and he leaves no room to
doubt the real meaning of the expression used by Pothier and
other civilians, and so much relied on by the appellant's coun-
sel.  (See Troplong on Prescription, Chapter 4, Sections 806
and 807.)

I have been able to find no text in Domat, which, by the
most strained interpretation, could be invoked as an authority
to sustain the proposition that prescription runs against a va-
cant estate in the sense contended for by Mr. Denison.  On
the contrary, that distinguished author considers the Roman
Law and the customary law of France as showing the most
tender regard for the interest of minors, and the greatest pos-
sible indulgence to the infirmities of their age.  And it should
not be forgotten that the old Roman Law, as practiced through-
out the Roman Empire, and the same law as adopted and
modified in more modern times, by the nations of continental
Europe, continued its care for the interest of minors much
longer than the Common Law of England.  By the Common
Law twenty-one years is the age of majority.  In all those
countries which are governed by the Civil Law, twenty-five
years is the age of majority.  This is a fact which, I think, is
very pertinent to an argument, the purpose of which is to vin-
dicate the Civil Law from the imputation of permitting the
rights of minors to be trampled on in a way which would never
be tolerated in any State where the Common Law of England
prevails.

The truth is, that the great Code which survived the wreck
of the civilization of which it is the noblest monument, and
which has been the basis of all modern legislation, is liable to
no such imputation.  Like its great rival, the Common Law,

it is careful of the rights of those who are not able to act for themselves.   It has its maxims to this effect, which have been quoted wherever the noble language in which it is written has been read or understood.   There is no difference in the spirit which prevails in the Common and the Civil Law.   The same great principles pervade both.   The same may be said of them, in this respect, which Cicero, in his defence of the poet Archia, said of the polite arts :  " Habent quoddam commune vinculum, ét quasi, cognatione quadam, inter se continentur."

Let us now briefly inquire what are the well known and universally recognized principles and rules of the Spanish Law on the subject of successions, and how far the prescriptions known to that law, operated to effect the interests of minors. The sixth Partida is so full and explicit on these subjects as to entitle it to all the praises which have ever been bestowed on that celebrated work for the wisdom of its provisions, and the lucid arrangement and exposition of its principles.   The first Law of the sixth Title explains what is meant by the time which was allowed to an heir to deliberate whether he would accept the estate or not, after the death of the ancestor—also, what advantages this time for deliberation secured to the heir, and what heirs would claim the time to deliberate.   The second Law of this Title fixes the time which an heir may have for deliberation.   The third Law of this Title provides that " during the time, which has been granted to the heir for de- " liberating, he cannot sell nor alienate anything belonging to " the estate of the testator, unless he should do it by order of " the Judge for some legal cause."   The fourth Law of this Title provides that " if he who is instituted heir to an estate, " take time to deliberate whether he will accept it or not, and " then decline accepting it, he is bound to return it to the cre- " ditors of the deceased, or to those who are entitled to it."

These laws show clearly that during the time granted to the heir to deliberate, and before the estate has been either ac- cepted or renounced, it is *actually* in the possession of the heir,

and not merely in his possession in contemplation of law. Now this is entirely opposed to the idea of a vacant estate, which is defined to be "an estate which is not claimed by any one as heir, or by any other title." The case just put in the fourth Law of the sixth Title of the sixth Partida is a case in which an estate is not claimed by any one as heir or by any other title, because the heir has not yet accepted ; yet the case supposes a person in the actual possession of the estate, deliberating whether he will accept it or not, and who may have it, if he chooses to have it. Will any one say that this is a vacant estate ? And if this be a vacant estate, is not the absurdity of Mr. Denison's propositions as applicable to such estate, but too apparent ? Yet in his brief, at the foot of the eighth page, he expresses the opinion, in a parenthesis, that an estate, not yet accepted, is a vacant estate ; while in fact there is nothing to show that the case put in the quotation from Salgado, is not the very same case which is put in this law of the Partida, which I have just been considering.

But let us inquire somewhat more particularly into the provisions of this Partida, concerning the rights of heirs who are minors. The thirteenth Law of the sixth Title of this Partida, is in the following words : "Every one who is not a slave or " a lunatic, or who is above twenty-five years of age, may enter " upon and acquire an estate which belongs to him, either by " will or in any other legal way, as soon as he is informed of the " death of the person from whom he inherits. But if he should " be a madman, or a lunatic, or a minor under seven years of " age, he cannot of his own authority take or acquire the suc- " cession, but they who have him under their guardianship *may* " enter upon it in his name, if they think it to his advantage to " do so. But if a minor under seven years of age, who is insti- " tuted heir to another, should be under the power of his father, " the latter may enter the estate in the name of his child. And " if the minor happen to die before he is seven years of age, and " before his father had entered on the estate, nevertheless the

"father may take possession of and acquire the estate for him-
"self, *and this, because it had already vested in the son.* We also
"say that no minor under fourteen years of age, and who is in
"the power or guardianship of any one, can enter upon and ac-
"quire an estate to which he has been instituted heir without
"the consent of his father or guardian. And if he should not
"be under the power of any one, he cannot acquire the estate
"without the authorization of the Judge of the place. But if
"if the person instituted heir be a minor, under twenty-five years
"of age, and above fourteen, and not under the guardianship of
"any one, he may then of his own authority enter upon and ac-
"quire the estate. But if, after he had taken possession of it,
"he should discover it was not to his advantage to retain it, he
"may change his mind and abandon it ; and this he may do, by
"way of restitution, inasmuch as he was not twenty-five years
"of age complete, when he took the estate."

Now this law breathes the very spirit of the whole system
of Spanish jurisprudence on this subject. It will be seen that
a minor under seven years of age, is not considered capable of
doing any thing concerning an estate of which he has been
instituted heir ; but those who have him under guardianship
*may* accept the estate for him. The language of the law is
not compulsory to the guardian or parent ; they *may* accept for
the minor, but are not compelled either to accept or reject ; nor
are the rights of the minor concluded by the action of the
guardian or by his failure to act. Still, *the estate is considered
as vested in the minor ;* because the law says that if the minor
under seven years of age happen to die, before his father had
entered on the estate for him, nevertheless the father may take
possession of and acquire the estate for himself, and this be-
cause it had already vested in the son.

The law then considers the minor at a more advanced age,
that is, until he is fourteen years of age, and it provides that
at no time before he is fourteen years of age, can he enter and
acquire an estate without the consent of his father or guar-

dian. And if he should not be under the power or guardianship of any one, he cannot acquire an estate, without the authorization of the Judge of the place. The law does not yet esteem the minor capable of acting for himself, but inasmuch as the acquisition of the estate of which he has been instituted heir, may be to his advantage, the law permits him to accept the estate and enter upon it, provided he has the consent of his father or guardian, or the consent of the Judge of the jurisdiction in which he resides.

The law then considers the minor at a still more advanced age, and provides that when he is above fourteen years old and under twenty-five, and not under the guardianship of any one, he may then, of his own authority, enter upon and acquire the estate. But so jealous was the law of the rights of parents and guardians over their children and wards, that it only allowed this privilege to minors who were not under the guardianship of any one. And so careful, on the other hand, was the law of the interests of this priviledged class of persons, that it did not charge the minor under twenty-five years of age, who had accepted and entered upon an estate, with the legal consequences of his act; for it goes on to provide that if, after he had taken possession of it, he should discover that it was not to his advantage to retain it, he may change his mind and abandon the succession. And the law gives the reason why he may do this, in the last clause : " and this he may do, inasmuch as he was not twenty-five years of age complete, when he took the estate."

But the heir was not only permitted, by the Spanish Law, during his minority, to renounce an estate after having accepted it, but he was likewise permitted to accept it after having once renounced it. The eighteenth Law of the Sixth Title of the sixth Partida, which treats of the renunciation of estates, says : " We also say that if the heir renounce the estate which "belongs to him, either by will or by reason of his relationship " to the decased, he cannot afterwards claim and recover it,

" *unless he were a minor under twenty-five years of age ;* for
" then if he should discover that he had renounced it to his pre-
"judice, he may afterwards claim and recover it, *by reason of*
" *his nonage,* at the time of the renunciation."

But it may be said that all this shows a most tender regard
for the rights and interests of minors, but does not reach a
case where property has been aliened under form of law and
acquired by a third person.

The twentieth and last law of the sixth Title of the sixth
Partida, puts the case of an alienation of the propety belong-
ing to the estate to which the heir is entitled, and provides as
follows : " Where the son or grandson who is above twenty-
" five years of age, renounces the estate of his deceased father
" or grandfather, he may claim and recover it within three
" years thereafter, if it should not be alienated ; but when
" once alienated, he cannot claim or recover it, *unless he were*
" *under age,* as we have above said."

This provision alone was wanting to complete the symmetry
of this body of laws, which I have quoted at considerable
length, to show how consistent the provisions are with each
other and with justice and right reason. And it is confidently
submitted to the Court that all these concurring provisions
are entitled to much greater respect as evidence of what the
Spanish Law was upon the subject of inheritances, and of the
right of heirs and minors, than the detached passages quoted
by the counsel for the appellant, not from the text of the Span-
ish Law, but from the writings of voluminous commentators.
If any objection lie against the Spanish Law on this subject, it
is that it goes too far.

As an example of the value of the dicta of commentators,
when compared with that of the text of the law itself, the
Court is respectfully referred to a citation made on the 9th
page of the brief of the appellant's counsel. It is there said
that Gregorio Lopez, in note 2d to the 29th Law of the 29th
Title of the third Partida, says, that " during the vacancy of

the succession, prescription is continued even without posses-
sion ;" and it is added that Gomez says the same thing in his
commentary on the 45th Law of Toro. There is nothing in
the law itself which could serve as a foundation for the pas-
sage quoted from that commentator. On the contrary, the
law referred to, speaks only of the interruption of prescription
in certain cases ; and the remark of the commentator must
have been made in view of other cases, which, in the course of
his disquisition, he was led to notice. And there is nothing
in the remark itself, which goes any way at all to establish or
aid in establishing the doctrine for which the appellant's coun-
sel contend with so much zeal. The commentator only says
that during the vacancy of a succession, prescription *is contin-
ued* even without possession. He does not say that it would
begin to run at such a time. This is nothing more than the
rule laid down, or rather applied, in the case of Tyson v. Brit-
ton, and which has obtained everywhere, viz : that when pre-
scription has once begun to run, it will continue to run, not-
withstanding the occurrence of a state of things during which
it would not have commenced to run. This is a rule of the
Common Law, as well as of the Civil Law, and is to-day the
law of every State in the American Union.

It is furthermore to be remarked, that no where in the text
of the Roman Law or of the Spanish Law, or even in the writ-
ings of the commentators, can any express provision be pointed
to, which declares a vacant estate to be a fictitious being, in
any such sense as that contended for by the appellant's coun-
sel. The idea of considering a vacant estate as a fictitious
being, *in all respects* representing its deceased owner, was re-
served for the framers of the Louisiana Code of 1808. That
Code was repealed in 1825, and was never the rule of decision
in this State. The Code of 1825 (of Louisiana) expressly de-
clares, that " a succession is acquired by the lawful heir, who
" is called by law to the inheritance immediately after the
" death of the deceased person to whom he succeeds." Nor is

there any provision of the Code of 1825, which by any fair interpretation can be construed into a sanction of the idea that a vacant estate was regarded as a fictitious being. On the contrary there are numerous provisions of that Code which are directly at variance with any such doctrine. Articles 934, 935, 936, 937, 938 and 939 of the Civil Code, are to this effect—

Article 3492 of the Code of 1825, declares that "prescription runs against a vacant estate, though no curator has been appointed to such estate." Now, by vacant estate as the term is used in this Article of the Code, is not meant the fictitious being of the Code of 1808, who so entirely represented the former owner of the estate. The term is used as it is used by Pothier when he speaks of the rights of creditors against an estate, and the obligations of debtors to an estate.

II. But it is argued further by the counsel for the appellant, that no suit can be brought by the heir of a deceased spouse, against the surviving partner of the community, or against a third person claiming under such survivor, to recover any portion of property acquired during the marriage, without showing that such property remains as surplus, after payment of the community debts.

The Louisiana decisions, to which Mr. Denison refers, do not sustain his view of the law. It is true that the community property is liable, *in solido*, for the community debts, and that the heir of a deceased partner of the community can only be entitled to what remains of the deceased partner's share, after such debts are paid. But it is not true that the heir of a deceased partner of a community must show by an administration, that there are no debts due by the community, before he can recover his interest in the deceased partner's share. The law does not go to that length. This Court incidentally applied the general rule on this subject in the case of Parker v. Parker, 10 Tex. R. 83.

The case of Adams v. His Creditors, 4 La. R., is not at all in point. It has no reference whatever to the question.

The case of Lawson v. Ripley, 17 La. R., 247, is not in point. The only question, or rather the main question in that case was, whether or not the Probate Court had jurisdiction of a suit for a settlement and liquidation of the community formerly existing between a deceased husband and a surviving wife, and for a partition of the residue after the payment of debts.

The case of Robin v. Castille, 7 La. R. 292, is rather an authority against the proposition of the appellant's counsel, than in favor of it.

In the case of Hart and others, heirs, v. Foley, 1 Rob. R. 378, the Judge said : " As our laws have provided no mode to " compel a regular settlement of a community dissolved by the " death of the wife, it behooves the creditors of the community " to interfere for the protection of their own rights. After the " death of one of the spouses, the community, in a legal sense " of the word, is terminated ; each party is seized of the one " undivided half of the property, subject to the payment of the " debts. The creditor who wishes to hold the heirs of the wife " responsible for a community debt, must join them in his suit " against the husband, for the latter no longer represents the " community, which is at an end."

The case of Fortier v. Slidell, and others, 7 Rob. R. 404, was a case in which a purchaser at a Sheriff's sale, who had purchased property encumbered by a judicial mortgage in favor of Slidell, and a general mortgage in favor of the heirs of one Puech, after paying over to the Sheriff the amount of the judgment under which the property was sold, retained the balance in his hands, and instituted suit against Slidell, the mortgage creditor, and the heirs of Puech, to compel them to come forward to adjudicate their respective rights to the balance remaining in his hands.

The suit was not by the heirs ; and the property was not of sufficient value to pay the mortgage debts.

Indeed, all the cases in the Louisiana Courts, where the rule contended for by Mr. Denison, has been laid down, were cases

where the record disclosed the fact that there were debts remaining due by the community, and most of them were cases where the heirs claiming were contesting with creditors, their respective rights to the property of the former community. In every case where it did not appear to the Court that there were unpaid debts of the community, the heirs have been held to be entitled to recover the share of the deceased partner of the community, without any previous settlement of such deceased partner's estate by administration.

But without further reference to the Louisiana decisions on this point, I take the question to be settled, in a case like this, by the Opinion of this Court in the case of Boyle v. Forbes, 9 Tex. R. 35.

In that case the Court said, " If the administration has been " closed, the presumption is that all the debts have been paid " off ; and it would seem that after a lapse of thirteen years " from the grant of administration, and no order for its con- " tinuing open, the presumption would be equally strong that " all the debts had been paid off. If this was not the case, the " creditors would have taken some steps ere this, to have had " them paid."

III. The argument of Mr. Denison, touching the applicability of our Statutes of Limitation, and the constructions of this Court applied to the various questions which have arisen upon those statutes, to this case, I deem it unnecessry now to discuss at any length, as I rely upon the proposition, which I think I have established, that no period of limitation prescribed by any law ever began to run against the appellee, during his minority. After attaining the age of majority, our law allowed him, to say the very least, two years within which to bring his action. The evidence places it beyond question, that he has brought himself within the provision of the law on this point.

*R. J. Townes*, also, for appellee.

HEMPHILL, CH. J. The important question in this cause may be resolved into two points, viz :

Can the plaintiff maintain this action, without first showing that the community of gains existing between his father and mother was settled in a regular course of administration, and that this land remained to the community after the payment of debts ?

2nd. Was the plaintiff barred of his action by prescription or limitation ?

The community was primarily liable for its debts and charges ; but it does not follow that the fact as to indebtedness could be ascertained only by administration. This may furnish more conclusive proof ; but without administration, there may be satisfactory evidence that no debts ever existed, or if so, that they have been discharged. And where, as in this case, there has been a lapse of thirteen or fourteen years, there is a presumption that the debts have been paid off ; and there being no evidence that any ever existed, the presumption is, that none ever did exist. Had any been owing at the death of plaintiff's mother, or had the land been sold to satisfy debts, there would doubtless have been some evidence of these facts. Where an heir, especially after so great lapse of time, sues for the share of a deceased partner in the community, the fact of indebtedness, if relied upon, must be established by the defence. Nothing of the kind was attempted in this case. There was no evidence about indebtedness, one way or the other.— We are of opinion that the action cannot be defeated on the supposed bare possibility that there might be debts against the community. It does not appear that any have been discovered, and it is not to be presumed that any would be developed by administration.

It is not necessary to consider what equities might be set up by a surviving husband, or his vendees, against the claims by the heirs of the deceased wife, for her share in the community : as, for instance, that the property is subject to or has

been disposed of in payment of debts; or that there is other property of the community, sufficient to satisfy the claim. No such points are raised in this case. Believing that the first ground is insufficient, and that the action will lie notwithstanding there has been no administration on the estate of the mother, which, in this instance, would be but a useless form, we will proceed to consider whether the plaintiff is barred by the laws of prescription.

This is the main point in the cause. It has been thoroughly investigated by counsel, and has been illustrated by some of the most consummate arguments. The ground is this, that by the laws in force at the time of the sales to the defendant, the estate of Milly, the deceased wife, would be held to be a vacant estate up to the commencement of this suit, that being the first and only act of acceptance on the part of the heir ; and a purchaser in good faith from the surviving husband would be protected by the prescription of ten years, although Milly's heirs were minors.

" A succession is called vacant when no one claims it, or when all the heirs are unknown, or when all the heirs to it have renounced it." (C. C. La. Art. 1088.) This definition is as precise, as full, and clear, as any to be found among the civil law authorities, and we will not accumulate definitions from other sources. That, as a general rule, prescription runs for and against a vacant estate, under the laws of Spain, there can be no question. The doctrine on this subject is concisely stated by Escriche, in his Dictionary, under the head of acceptance of inheritance. Discussing the effects of such acceptance, he says that it retroacts to the day of opening of the succession : that is to the day of the death of the person whose succession it is ; that the effect of this retroaction is that the acceptance by the heir, at whatever epoch of time this may be, is the same as if he had accepted at the moment of the death of the deceased ; but among other effects of such acceptance, it is said, that prescription will run for the benefit of the

heir during the time between the death and acceptance, for the reason that third persons, having an interest, might interrupt the prescription, by proceeding against the heir himself, or by causing a curator of the vacant inheritance (in case the residence of the heir was unknown,) to be appointed, against whom they could enforce their rights ; and that, in the same manner, prescription would run against the heir, because the vacant inheritance represents the person of the deceased, and the negligence of the heir ought to be imputed to himself, and cannot prejudice third persons.   The rule as to prescription is here propounded by the author without any exception in favor of minors ; but under the word *Herencia*, in treating of actions for the recovery of an inheritance, he declares that though a possession in good faith may gain the inheritance by prescription of ten years between those present, and twenty between the absent, and thirty where the possession is in bad faith, so that the true owner who will not prosecute his action will, by his negligence, lose his rights ; yet there is an exception in favor of the minor, against whom prescription does not run during minority ; citing L. 7, Tit. 14, Partidas 6.  This law fully supports the position of this eminent commentator, and whatever may be the construction, under the Codes of Louisiana, as to the universal operation of prescription against vacant estates, including minors as well as adult heirs, yet it would seem that by the laws of Spain, at least in the opinion of Escriche, there would be an exception in favor of minority.

But, if it be admitted that no such exception exists, and that by the legitimate operation of Spanish law, minor as well as adult heirs were excluded, as against third possessors, provided they did not accept the estate within a limited period ; yet we are of opinion that this doctrine has not, nor can it be allowed, any such operation, under our laws and their construction and the established usages and practice in relation to the estates of deceased persons, as would materially benefit the defendant or preclude the plaintiff from his action.

It is doubtful whether, within the scope and meaning of the terms in Spanish law, there was any such thing as the vacant estate of the civil law known to our jurisprudence after December, 1836. In the Act organizing inferior Courts, December 20th, 1836, the Chief Justices of counties were by the 24th Section made Judges of Probate, and were required to take probate of wills, grant letters of administration, appoint guardians of minors, idiots and lunatics, &c. ; but there was no allusion to acceptance of estates by heirs, and no proceedings directed to take such acceptance. It might be inferred that administration was to be had on all estates where there was no will. Now, under the Spanish and Louisiana laws, there was no necessity for administration, as the term is understood at common law, where there was an acceptance of the estate by the heirs. The simple acceptance of the heir, when made by one of full age, bound him unconditionally to pay all the debts of the succession, even out of his own property, should that be required ; and if an heir demanded the benefit of deliberation and inventory, and an administrator be in the mean time appointed, yet, if at the expiration of the term of deliberation, the heir accept unconditionally, all the effects must be delivered up to him ; (Art. 1048, C. C. L.;) and even where there is a curator of what is denominated a vacant succession, whose term of administration is fixed at one year, yet the heirs may take possession before the end of this term. No such proceedings were known or recognized in practice under our laws, between 1836 and 1840. What may be the effect on the rights and obligations of heirs who accepted tacitly or by their acts, during this period, it is not necessary to discuss. The rules in relation to acceptance were in no degree enforced, observed or recognized. Administrators were generally, if not universally, appointed, and heirs were not allowed to disturb them until the debts were paid, and their administrations had closed.

It is very possible that as actual possessors, the heirs might have been enforced to discharge the debts of the estate ; or, if they, being adults, suffered the property to be possessed by

third persons, they might, on general principles, be barred by lapse of time or limitation, and this without adopting the fictitious being known as the vacant estate.

But whatever may have been the law in relation to vacant estates, and to prescription for and against them, we believe this to have been abrogated on the introduction of the common law in 1840, and other laws passed during that session.— It will be recollected that an estate is vacant because not accepted by heirs, and when accepted, they have, as a general rule, the right of possession, either with or, as the case may be, without the benefit of inventory. But in the probate law of 1840, which was intended as a general regulation for the settlement of successions, nothing is said in relation to acceptance by the heirs, but provision is made for the grant of administration on the estates of all persons who may die intestate, without any discrimination as to whether the heirs were present or absent, whether they accepted or renounced ; they were not in fact required to do either. The law proceeded on the supposition that the property was in the heirs, subject to the payment of debts, and administrators were appointed to pay the debts, and to prepare the property for distribution.— Not a word is said throughout the law, in relation to acceptance or otherwise by the heirs, and we must hold that no such acceptance was necessary to vest the estate in the heirs, and consequently that an estate was not, in contemplation of law, vacant for want of such acceptance. If then, the estate of Milly, the mother, was vacant, and if prescription did run against a minor heir of such estate during minority, as is contended by appellant—but whch, to say the least, on a true construction of the law of the Partidas, is very doubtful—yet by operation of the laws in 1840 the estate must be regarded as vesting in the heir, without any express, formal or tacit acceptance ; and if so, the defendant cannot claim the benefit of prescription, as sufficient time had not elapsed to complete the bar.

As to whether the time which run under the laws of Spain, could be computed and estimated as a part of the two years allowed a minor after age, under the law of 1836, to bring his suit, we are of opinion that it cannot be considered in the estimate. A definite time is allowed after a fixed event, viz : the coming of age, and this .cannot be diminished by deductions for time elapsing before arrival at age. If, after arriving at age, the law was modified, allowing a shorter or longer time for suit, the time which had expired under the previous law, might be allowed in computing the term of limitation.

The judgment, as one in partition, might have been expressed in different terms, or its directions might have been modified ; but as it seems to attain the justice of the case, it is not deemed necessary te reverse and render in this Court, and it is therefore ordered that the judgment be affirmed.

Judgment affirmed.