# W. D. THOMPSON ET AL. V. MARTHA J. CRAGG ET AL.

A decree of the District Court against children, "as the heirs of their deceased father," for specific performance of a bond, given by the father for title to land, the community property of himself and wife, sold by him in 1837, after the death of his wife, does not affect the interest which the defendants have in the land, as heirs of their mother.

Nor will such bond, decree, and the deed of a commissioner appointed by the court to convey the title, vesting in the purchaser all the right, title and interest in the land of the obligor and his heirs, constitute such title, or color of title, as will support the plea of the statute of limitation of three years, against the children, suing as heirs of their mother; five years is the shortest period which will render such title effectual against them.

Color of title, as defined by our statute, differs from title only in externals, and cannot exist when there is a complete *hiatus* in the chain.

But such muniments of title are sufficient to entitle the defendants to have the question of the good faith of their possession, and the value of their improvements, submitted to the jury.

In suits for partition, where there is no controversy about the title, the equities between the parties growing out of the improvements and ameliorations, may be settled by the court, with the aid of the commissioners.

But where the main question between the parties is, as to the title, with a prayer for partition; when that is decided, if the question of good faith be involved, it is the right of the defendants to have it determined, and the value of their permanent and valuable improvements ascertained by the jury, and secured to them in the ultimate partition.

Evidence that the surviving father was a poor man, unable to work for his children, and that the sale of the land was necessary for their support, is properly rejected; to sustain the sale on such grounds, would withdraw the most important rights from the courts, and commit them to the capricious inclinations of individuals.

The statute of limitations commences to run against females who marry under the age of twenty, in accordance with the laws of this state, from the time of such marriage. (White v. Latimer, 12 Texas Rep. 61, to this point, affirmed.)

Upon the dissolution of the marriage, by the death of one of the spouses, the survivor, under the Spanish law, has not the right to sell the whole of the community property, but one-half of it descends immediately to the children of the deceased spouse, subject only to the community debts.

The different provisions of the Spanish law on this subject, and the commentators thereon cited, and shown to agree with the former decisions of this

court, and those of the Supreme Court of Louisiana; and to be contrary to, and in conflict with, the case of Panaud v. Jones, 1 California Rep. 448.

The 14th law of Toro, authorized the surviving spouse to dispose of his or her portion of the community or ganancial property, without being obliged to retain it for the children of the marriage, as they were bound to do with reference to property acquired by lucrative title; but that law did not mean that they might dispose of the whole of it.

APPEAL from Williamson. Tried below before the Hon. Edward H. Vontress.

This was a suit of trespass to try title, and for a partition, by Martha J. Cragg and her husband, and Eliza Holder, the widow of William Holder, against W. D. Thompson, Freeman, James K., Benjamin F., and Moses Smalley, Aaron Rubel, Thomas Bacon, and others.

There was a judgment against the plaintiffs, in favor of the Smalleys, Rubel and Bacon, on the plea of the statute of limitations, and in their favor against Thompson and the other defendants. The plaintiffs moved for a new trial, as against the defendants, in whose favor judgment was rendered against them; and Thompson and the other defendants, against whom the plaintiffs recovered judgment, also moved for a new trial; both motions were overruled, and the plaintiffs, and the defendants Thompson and others, each gave notice of an appeal.

The facts are stated in the opinion.

*J. A. & George W. Paschal,* for the appellant.—We assume it as a sound principle of law, that the decree of the District Court could not be attacked or impaired collaterally; being between the same parties and their privies, for the same subject-matter, it was conclusive not only of the things determined, but which might have been determined between the parties in that suit; the object of that suit was to obtain a full conveyance; and the question of the father's right to sell the whole community interest, not only might have been presented, but was presented and determined; and if in this there was error, the remedy of the parties was by writ of error, or bill of review, which they

might have prosecuted at any time after their majority, within two years; but having acquiesced, they cannot be heard collaterally to impair the decree, or to assert their rights behind it. All these propositions the instructions assumed, as also, that Holder, as the survivor, had the right to sell.

These principles, without exception, unless for fraud, have been universally maintained from the Duchess of Kingston's case, down to this day. But it can hardly be necessary to push the discussion beyond the decisions of this court. It was first discussed, and the general authorities reviewed by the court and counsel, in the case of Southerland v. De Leon, 1 Texas Rep. 250; and the court decided, that where the court had jurisdiction, and the jurisdiction attached, the judgment would be conclusive. In this very first case, the broad principle in Grignon v. Astor, 2 Howard, 343, so often recognised as law by this court, was approved.

In Grassmeyer v. Beeson, 18 Texas Rep. 764, this court says: "Having heretofore determined that the court had jurisdiction to render the decree, it is perfectly clear that it is conclusive of the question therein adjudicated; and they are not now open to examination or discussion, unless the decree was obtained by fraud." And the learned judge cites Shannon v. Taylor, 16 Texas Rep. 413. In the last named case, it was simply held, that the decree for specific performances was binding upon the heirs, although they were not made parties to the suit.

In Foster v. Wells, 4 Texas Rep. 104, Justice LIPSCOMB said: "The general proposition, that the judgment or decree of a court of competent jurisdiction, should be final, as to the matter determined, cannot be controverted. The principle, however, extends further; it is not only final as to the matter actually determined, but as to every other matter which the parties might litigate in the cause, and which they might have decided." In support of which, the learned judge cites 1 Johns. Cases, 436, and 1 Blackford's Rep. 360; and at the same term, same vol., p. 388, the same principle was solemnly re-affirmed. (See Le Guen v. Gouverneur & Kemble, 1 Johns. Ca. 492. The note

of the learned editor shows, that the doctrine has become universal.

In Cannon v. Hemphill, 7 Texas Rep. 194, Chief Justice HEMPHILL says, that "the character of the judgment must be tested by its operation on the objects sought by the proceedings." And see the same rule in Foster's case; 1 Greenleaf's Evidence, § 534 ; Yates v. Houston, 3 Texas Rep. 433. This case recognised the principle of the Duchess of Kingston's case, and of the various cases since affirmed by this court.

The court below gave much less effect to the judgment of a court of acknowledged general jurisdiction, than this court has given to the judgments and decrees of county courts, which are only courts of general jurisdiction *quoad* the estates of deceased persons. (See the cases of Alexander v. Maverick, 18 Texas Rep. 179 ; Soye v. McCallister, Id. 80 ; and Soye v. Maverick, Id. 100.) In the last case, the very question as to the necessity of administrating upon the estate of the mother, in order to sell the entire inheritance from both estates, was raised and decided in favor of the sale by the father's administrator only; for which the learned judge cites Jones v. Jones, 15 Texas Rep. 143; and Berry v. Young, Id. 369. The analogy certainly holds in this case, since none others than the administrator need have been made parties. The same principle was, in fact, held in Grande v. Herrera, Id. 533.

If the court agree with us as to the proper legal construction of this decree, then it operated as an estoppel, and the case must not only be revised, but the cause dismissed.

But if we were wrong, and the equities were before the court *de novo*, then there was error in excluding evidence that the sale was necessary; that the land was sold for its full value at the time of the sale; and that the heirs were left in no worse condition because of the sale. It was decided at the last term of court, in a case, the name of which is not recollected, that if the sale was necessary, and the succession was not left in a worse condition by the sale, then the heirs have no right to complain, and equity will uphold the sale.

38

It has never been determined by this court, that the father who survives the mother, has not the right to dispose of the head-right claim, for the support of himself and children. It is even doubtful if it be not an absolute right at law. It was so ruled in California, in the case of Panaud v. Jones, 1 Cal. Rep. 488, to which particular attention is called. Certainly, if it was error to do so, it was *communis error;* and to disturb the sale, would be to unsettle a vast amount of rights, upon which fortunes rest. Indeed, it would be to light a magazine, far more dangerous, than that which underlies dishonest administrators' sales.

The 15th section, or the three years' statute, is analogous to the statute of 21 James I., ch. 16, entitled "An act for limitation of actions, and for evading suits at law," and to the various modifications which this statute has received in the United States. They are all collected in the appendix to Angell on Limitations. They generally provide, almost in the terms of our three years' statute, that all actions for the recovery of the possession of real estate, shall be brought within periods varying from twenty years, as in England, to three years, as in South Carolina—the average being, perhaps, seven years. That our three years' statute is in analogy to the statute of James, has been expressly ruled by the Supreme Court of the United States, in Christy v. Alford, 17 Howard, 601. The analogy being established, or rather the identity being established, the period of time cannot change the rule of interpretation. We are then to inquire, when, and where, and how firmly is the doctrine established, that a link in the conveyance, void in whole or in part, is yet a good connecting link for the purposes of the statute, if there be, as in this case, no want of intrinsic fairness and honesty.

This court has already settled, in numerous cases, that five years' possession, under a void deed, would protect the possession. (Charle v. Saffold, 13 Texas Rep. 94.) And the Arkansas case, reviewed by the Chief Justice, Pillow v. Roberts, 13 Howard, 472; as also the case of Clarke v. Courtney, 5 Pet. 318, were both upon statutes, similar to that of 21 James I.;

they hold the principle, that a void deed will serve as the basis of prescription.

And it would be difficult to draw any satisfactory distinction between the character of papers, because of the period of time. "A deed duly registered," would seem to imply a lawful deed, executed by a grantor, who had the right to sell, and without duress, and in his right mind did sell, in the form and manner prescribed by law,—a deed in law and in fact, duly acknowledged and duly registered,—having, in a word, all the essential requirements of the law, and untainted by fraud. But as such a deed would need no time to support the possession under it, it has become a necessity, to regard the paper merely as evidence of the extent of adverse possession,—as *notice* to the rightful owner, and as the *instrument* to prove forfeiture; or, if you will, the creature which draws after it many legal *presumptions*, having no foundation in truth. Upon whatever grounds the doctrine may rest, it is now too well settled, that the five years' possession, under a void recorded deed, cannot be disturbed except for fraud, and that is a doubtful exception.

Now, title is the just cause of possessing that which is our own; a deed is one link in that title; and color of title, even with the aid of the definition in the statute, and the case of Castor v. Wurzbach, is a term of uncertain signification. All that the statute really determines is, that those relying upon the three years' statute, must deraign their title down from under the sovereignty of the soil; not that all of the chain of title should be adverse to the papers, or come in a different direction from some of the muniments of the adversary claim; because both may claim under the same patent, and under the same mesne conveyances, down to the very last, or any intermediate link. Let us now inquire how far the precedents support us.

As early as 1823, in Porter v. Cocke, (Peck, Rep. 30,) an able opinion was delivered upon the subject, by that very learned man, Judge BROWN. The discussion commences on page 30. The Tennessee Statute of 1797, "requires that the person claiming its benefit 'shall have had seven years' peaceable possession,'

' by virtue of a grant, or deed of conveyance, founded on a grant;' and when the deed is executed, and by law it has relation to the sheriff's sale, and passes the title from that time, then the intermediate possession is, by the most rigid construction, held by virtue of this deed." The discussion was long and rigid, and the objection, that the deed was founded in fraud to avoid creditors, fairly met. The deed was shown to be good for many purposes, and among them, to protect the seven years' possession.

In the case of Harris and Holmes v. The Lessee of Bledsoe's heirs, Peck, Rep. 234, Judge EMMERSON, reviewing the previous history of the subject, in North Carolina and Tennessee, says all that could be said on either side of the question, in this state. He holds that a connexion is necessary, but that connexion need only be by color of title. (See also, 1 Haywood, Rep. 319.) The subject was also discussed in Paschal v. Davis, 3 Kelly, 256, and Conyers v. Kenan, 4 Ga. Rep. 309. And see Gray v. Darby's Lessee, Martin & Yerger, 396; Skyle v. King, 2 A. K. Marshall, 385. We also refer to Moore v. Brown, 11 Howard, 414, as well for the analogy of the Illinois statute, as the weight of authority of Chief Justice TANEY, and Judges CATRON and GRIER. And in Beverly v. Burke, 9 Ga. Rep. 440, Judge LUMPKIN defines " color of title to be a writing, upon its face professing to pass title, but which does not do it, either for want of title in the person making it, or from the defective conveyance used; a title that is imperfect, but not so obviously so, that it would be apparent to one skilled in the law." And he succinctly reviews the New York cases, which show that a void deed is good to prescribe under. And in English v. Register, 7 Ga. Rep. 387, and Pendergast v. Gullatt, 10 Id. 219, it was held, that color of title might exist in parol. The subject is treated in Angell on Limitations, chap. 31, §§ 400, 401, and note to § 400, which cites Ewing v. Burnet, 11 Pet. Rep. 41; Patton's Lessee v. Easton, 1 Wheaton, Rep. 476; Powell v. Harman, 2 Pet. Rep. 241.

*H. P. Brewster* and *Hancock & West*, for the appellees.—

That land, acquired as a colonist, is community property, is not an open question in this court; and it is equally well settled, that upon the death of either party to the community, the estate of such party is cast at once upon the heirs, and passes from the control of the survivor. (Yates v. Houston, 3 Texas Rep. 433; Duncan v. Rawls, 16 Id. 478.) These principles, applied to the facts in the record, establish an unquestionable right to a recovery, on the part of the plaintiffs below, and can only be successfully encountered by the pleas of limitation set up by the defence.

In support of this defence, the decision in the case of White v. Latimer, 12 Texas Rep. 61, is especially relied on. The doctrine of this case, so far as it adopts the view that cumulative or successive disabilities cannot be held to aid each other, is not disputed, although the current of decisions is not uniform. If there be any error in that decision, it is to be found in the construction given to Art. 2420, Hart. Dig., the re-examination of which, with the utmost deference to the opinion in that case, we ask at your hands. It is contended, that in the case just cited, the court enlarged the meaning of Art. 2420, beyond the just import of its words, and beyond the object and intent of the legislature. The object of the act, of which this article is the first section, is expressed in its caption, the "better to define the marital rights of parties;" and by its provisions, only relates to the rights and liabilities of such parties, touching their common and separate property, founded upon or growing out of their voluntary acts; and nowhere, and in no terms, refers to the rights of either in any forum, but leaves them as they were before. The words, "shall be deemed to be of full age," means only for the purposes enumerated in the same article, and those necessarily incident, to wit, that "she shall have all the *rights* and *privileges* of," not that she shall be subject to the duties, liabilities, or requirements imposed by law, or any other than those into which she might voluntarily enter.

As the law stood, before the passage of the act, "the better to define the marital rights of parties," the wife being an infant,

had no right to contract debts, except for necessaries; nor was the power anywhere conferred upon such, to dispose of her separate property by gift, sale, or devise, or in any manner to affect it. This was supposed to be an evil; certainly, in many cases, it was a hardship. To remedy this, the law of 13th March, 1848, was passed; and in order to give it completeness and effect, it was necessary to enable the married woman, being an infant, to bind herself voluntarily, as to her common or separate property. The object of the law manifestly appears to be, to enable her to bind herself by contract, deed, or other voluntary act, to dispose of property by will, &c. These were rights and privileges not theretofore hers; it is an enabling provision, and will not, unless the words lead uncontrollably to such a conclusion, be construed to deprive her of any advantage or indulgence, extended to her before its enactment. Infants, married women, and all persons laboring under disabilities, are favored in equity, and by the legislation of all civilized countries; it derives its force and authority from the humane policy of all systems, to protect the weak against the strong, the incapable against the intelligent. Enactments, going to affect injuriously the rights of such persons, are *odious*, of which the restriction tends more certainly to equity, than the extension. For, "in things *favorable*, it is better to pass beyond the point, than not to reach it; in things *odious*, it is better not to reach it, than to pass beyond it." (Vattel, Book 2, p. 264, ch. 17, § 300.) To adopt the construction of Article 2420, announced in White v. Latimer, is not only to deprive infants of favors and indulgences extended to them, by every system of law in the civilized world, and generally, with far greater liberality than here, but affects the very persons that it is the object of law to protect, and that, too, for a reason at war with the social policy of all Christian people,— her marriage, "in accordance with the laws of the State."

The Act of 13th March, 1848, *removed* no disability, as to her right to prosecute a claim in court, because she labored under none; she was at no time disabled from suing; she was only excused from the necessity of doing it, during the existence of a

Thompson v. Cragg.

legal impediment. So far as such rights are concerned, she is left in precisely the same situation she was before the act was passed. If then, in reference to these, she has no privileges and facilities, not enjoyed by her before, why shall she be denied the favor and indulgences thereby extended to her? The effect of the construction in White v. Latimer, is to say to a party in the situation of one of the plaintiffs in this case ; you cannot have the favor extended to a minor, because you are a married woman, nor those of a married woman, because you are a minor.

BELL, J.—I will state, as preliminary matter, a few of the leading facts of this case, that the opinion may be the more easily understood.

Prior A. Holder emigrated to Texas in the year 1833. He was a married man, and received a grant of a league and labor of land, as a colonist. The league of land was located on Brushy creek, by Thomas Kinney, who received one-half of it, for locating, surveying, &c. Julia Holder, the wife of Prior A. Holder, died in December, 1836, leaving two children, William Holder, who was born in October, 1832, and Martha Jane, (now Mrs. Cragg,) who was born in December, 1835.

William Holder, the son of Prior A. and Julia Holder, married Eliza Vandever, and died in April, 1856, leaving the said Eliza, a widow, without children. Martha Jane, the daughter of Prior A. and Julia Holder, married Richard Cragg, on the 31st day of August, 1852. On the 24th of April, 1837, Prior A. Holder sold the remaining half of his headright league of land, to W. D. Thompson & Co., and executed a bond for title. Prior A. Holder died in November, 1837, leaving no children, except William and Martha Jane.

In March, 1847, W. D. Thompson and O. B. Smith, instituted suit in the District Court for Bastrop county, on the bond executed by Prior A. Holder to W. D. Thompson & Co. Their suit was against Thomas H. Mays, who was the administrator of Prior A. Holder's estate, and against the minor children of Prior A. Holder, namely, William and Martha Jane.

In this suit there was personal service on the minors. Thomas H. Mays was appointed their guardian *ad litem*, on the trial. Mays answered, confessing the allegations of the petition of Thompson and Smith, and the court rendered judgment, appointing commissioners to partition the head-right league of Prior A. Holder, and to set apart to the said Thompson and Smith, one-half of it; and also appointing a special commissioner to execute to the said Thompson and Smith a deed to the half so set apart to them by the commissioners, which deed should convey to the said Thompson and Smith, "all the interest that the heirs of the said Prior A. Holder may have had, in and to the lands so set apart."

The commissioners appointed by the court divided the land, made their report, and on the 22d day of October, 1847, Preston Conlee, the special commissioner appointed for the purpose, executed a deed to Thompson and Smith, in conformity with the previous decree of the District Court for Bastrop county.

This suit was instituted on the 11th day of February, 1857, by Martha Jane Cragg, and her husband, Richard Cragg, and Eliza Holder, the widow of William Holder, against Freeman Smalley, and many other defendants. Thompson was made a party by amendment, filed 17th March, 1858.

Martha Jane Cragg sues for her interest in the land, as heir of her mother, Julia Holder, and as entitled to a portion of the interest of her deceased brother, William Holder, which he inherited from his mother, Julia. Eliza Holder sues for the interest to which she is entitled, as surviving wife of William Holder. During the pendency of the suit, Eliza Holder intermarried with John R. Hubbard, who joined her in the suit, as a party plaintiff.

The original petition was in the form of an action of trespass to try title, the plaintiffs claiming the whole of the half league of land. The defendants pleaded the statute of limitations, in all its various provisions. They also pleaded title in themselves for nineteen years, the staleness of the demand of the plaintiffs, and valuable improvements made in good faith. By the amend-

Thompson v. Cragg.

ed petition, filed March 17th, 1858, the plaintiffs set out the facts upon which their claim of title rested, limited their claim to half of the half league, and asked for partition between themselves and the defendants in possession.

The defendants all claim under the sale by Prior A. Holder to Thompson and Smith, the decree of the District Court of Bastrop county, and the deed of the commissioner, Preston Conlee, made in pursuance of the decree. On the trial of the cause, the court below treated the suit as one for partition merely, arrested the defendants in the introduction of evidence of the value of their improvements, and excluded all evidence in relation to the value of the improvements, from the consideration of the jury.

The instructions given by the court to the jury, were in some respects contradictory, owing, doubtless, to the fact that many instructions were asked by the parties, which the court did not take time sufficiently to scrutinise. In what appears to be the general charge given by the judge, of his own motion, the jury were told, that the decree of the District Court of Bastrop county might be looked to by them, as one of the links of a title, or color of title, as those terms are used in the three years' statute of limitations. He instructed them particularly in reference to the statute of limitations of three years, and of five years. The judge also gave the 6th instruction asked by the plaintiffs, (in connexion with others asked by them,) which was to the effect, that under the title presented by the defendants, it would be necessary for them to show five years' uninterrupted and peaceable possession, using, cultivating, and paying taxes on the land; and that if they failed to show all those circumstances, the plaintiffs were entitled to recover the land.

The plaintiffs then asked the court to instruct the jury, that the statute of limitations of three years, was not applicable to the title offered in evidence by the defendants, except as to the interest of Prior A. Holder in the land. This charge was refused by the court.

The court then instructed the jury, at the request of the defendants, Freeman Smalley and those claiming under him, that

if they found from the testimony, that Freeman Smalley was in possession, under title or color of title, for three years from the time the cause of action accrued to the plaintiffs, before the 11th of February, 1857, they would find for the said Smalley and those claiming under him, to the extent of the boundaries in the deed from Smith and Thompson to Freeman Smalley. The court also instructed the jury, at the request of the said Smalley and those claiming under him, that the decree of the District Court of Bastrop county, and the deed of the commissioner, made in pursuance of said decree, constituted color of title, as contemplated in the three years' statute of limitations.

At the request of the other defendants, the court instructed the jury, that the decree of the District Court for Bastrop county, and the conveyances under it, were good title and color of title, to support the plea of the statute of limitations of three years, as to all the defendants who had possession under the said decree and conveyances, before the commencement of the suit; and that the statute of limitations began to run, as to Martha Jane Cragg, from the day of her marriage, and against William Holder, from the time of his becoming twenty-one years of age; that the statute did not cease to run until the commencement of the suit; and that so far as the defendants were in possession, three years from the date of the marriage of Martha Jane Cragg, and from the time William Holder became twenty-one years of age, they were protected by the statute of limitations of three years. There were other instructions given and refused, not necessary to be particularly noticed here.

Upon a view of all the instructions given and refused by the court, it is obvious, that the court below was of opinion that the decree of the District Court for Bastrop county, and the deed made in pursuance of it, only affected the rights of the children of Prior A. Holder, as *his* heirs, and that they did not affect their rights, as heirs of their mother, Julia Holder; but the court was, at the same time, of opinion, that the decree and the commissioner's deed, constituted such color of title, as would support a possession of three years, under the appropriate plea.

As our opinion will lead to a reversal of the judgment of the court below, I shall proceed to state, as succinctly as possible, and without any extended discussion, wherein we believe the court below to have erred, and wherein our opinion coincides with the views which, it is plain, were entertained by that court.

In the first place, we are of opinion, that the decree of the District Court of Bastrop county, only concluded the rights of the children of Prior A. Holder, in the half league of land, so far as they were entitled through him, and that it did not affect the interest which they had in the land, as heirs of their deceased mother, Julia Holder.

It is contended by the counsel for those parties, who were defendants in the court below, that the children of Julia Holder ought to be, in all respects, concluded by the decree of the District Court of Bastrop county, because they were parties to it, and because the question of Prior A. Holder's right to sell the whole of the land, was a question which might have been adjudicated in the Bastrop suit. The object of the suit in the District Court of Bastrop county, was simply to have the bond of Prior A. Holder carried into effect; and nothing more can be claimed for the decree, than was asked in the suit. The minor children of Prior A. Holder were parties to the suit, as the heirs of Prior A. Holder, and in that capacity only. Let us suppose that Prior A. Holder had not been dead, and that a suit had been brought against him on the bond, for specific performance. It will not be pretended, that a decree, vesting all his right, title and interest in the land in Thompson and Smith, would have affected the interest of his children, as heirs of their mother; and yet, in the case supposed, the question of Prior A. Holder's right to sell the whole land, would have been as much involved, or might have been as much involved, as it could possibly have been in the suit, the effect of which we are now considering. Nor can the proposition be maintained, that the minors were, in all respects, concluded by the decree, because they were parties to it. To state this proposition in another form, would be to say, that the heirs of A. being also the heirs of B., are affected

in their rights, as the heirs of A., by a decree against them, as
the heirs of B., when their rights, as the heirs of A., were not
involved in any way in the suit in which the decree was ren-
dered. Let it be borne in mind, in the case before us, that the
legal *status* of the minors, William and Martha Jane, as the
heirs of their father, was something entirely distinct from their
legal *status*, as the heirs of their mother, just as the estate of
their mother, in the head-right league of land, was, after her
death, a legal entity, entirely distinct from the estate of their
father, in the same league of land.

I will put a case which, I think, will set the matter in a clear
light. Let us suppose, that when Prior A. Holder and Julia
Holder intermarried, each of them had two children, born of
former marriages. With these children, let us suppose them to
have emigrated to Texas, and acquired a head-right league of
land ; let us suppose the mother to die, leaving her two children
by a former marriage, having borne no children to her last hus-
band ; let us suppose Holder, after his wife's death, to sell the
league of land, and give bond for title, and afterwards to die,
leaving his two children, the fruit of his first marriage ; let us
suppose that suit *is* instituted against his administrator, that his
two children are made parties ; that a specific performance of
the bond is asked, and a decree rendered, vesting in the obligee
in the bond, all the right, title, and interest of Holder and his
heirs, in the league of land. Would the heirs of Mrs. Holder
be in any way affected by all this ? Certainly not. No more
can the heirs of Mrs. Holder be affected by this Bastrop decree,
for the case last stated and the case now before us, are the same.

We are of opinion, that the decree of the District Court of
Bastrop county, and the commissioner's deed, and the subse-
quest conveyances to the defendants, which were in evidence on
the trial, do not constitute such title, or color of title, as will
support the plea of the statute of limitations of three years.
These muniments do not constitute title; because, as has been
already said, the Bastrop decree did not touch the interest of the
heirs of Julia Holder, *as such*, in the land. Nor can there be

color of title, as defined by the statute, where there is a complete *hiatus* in the chain. Color of title differs from title only, in externals. The substance of both is the same. Were this not so, if color of title were something intrinsically and substantially less, or weaker than title, then the wisdom of the legislature could not be vindicated, in applying the same period of limitation to a possession supported by the one, as is applied to a possession supported by the other. The shortest period of limitation, of which the defendants could avail themselves in support of the title exhibited in evidence, is five years.

We are of opinion, that the defendants exhibited such muniments of title, as secured to them the right to have the question of the good faith of their possession, and the value of their improvements, submitted to the jury. The suit could not properly be treated as a suit for partition merely. The main question between the parties, was the question of title. In suits for partition, where there is no controversy about the title, the equities between the parties, growing out of improvements and ameliorations, may be settled by the court, with the aid of commissioners appointed for that purpose. But in a case like the present, where the question of good faith is involved, it is the right of the defendants to have that question determined; and if their possessions be found to be in good faith, then it is their further right to have the value of their permanent and valuable improvements ascertained by the jury, and secured to them in the ultimate partition. These questions, concerning the value of improvements, in a case like the present, can be most conveniently disposed of by submitting issues to the jury respecting the value of the different tracts claimed by the defendants respectively, with and without the improvements.

We are of opinion, that the court did not err in rejecting the evidence offered, that Prior A. Holder was a poor man, unable to work for his children; that the sale of the land was necessary for the support of his children, &c. This court has never gone so far as to decide that the surviving father or mother could sell that portion of the community which vested in the heirs of the

deceased partner, for the support of the family ; and to uphold sales upon such grounds, would be to withdraw the most important rights from the control of those tribunals authorized by law to guard and protect them, and to commit them to the capricious inclinations of individuals.

The record discloses the fact, that Martha Jane Holder, now Mrs. Cragg, married in 1852, being about seventeen years of age at the time of her marriage. It is argued by her counsel, that the statute of limitations did not commence to run against her, until she attained the age of twenty-one years ; and we are asked to reconsider the decision of this court upon the point, in the case of White v. Latimer, 12 Texas Rep. 61. It is contended that our statute, (Art. 2420 of Hart. Dig.,) which provides " that every female, under the age of twenty-one years, who shall marry in accordance with the laws of this state, shall, from and after the time of such marriage, be deemed to be of full age, and shall have all the rights and privileges to which she would have been entitled, had she been, at the time of her marriage, of full age," was intended to endow females, who should marry under the age of twenty-one years, with all the capacities, rights and privileges of persons of full age, but not to deprive them of any advantages which they might claim by reason of non-age. The statute will not admit of this construction. The language used, "shall be deemed to be of full age," we think must be taken to mean, that the person spoken of shall be deemed to be of full age for all purposes.

The position was assumed in the court below, and has been also taken in this court, that under the Spanish law in force at the time when Prior A. Holder sold the land in controversy to Thompson and Smith, he had the right to sell the whole of the land, after the death of his wife. And we are referred to the case of Panaud v. Jones, 1 California, Rep. 488, where the proposition is distinctly and emphatically asserted, that by the law of Spain, one half of the community property did not vest in the children of the marriage, upon the dissolution of the marriage by the death of one of the spouses ; but that the common pro-

perty, not one half, but the whole, was a security for the payment of debts contracted for the common benefit, and also by the husband, after the death of the wife; and that neither the heirs of the wife nor of the husband, have any interest except in that portion which remains after the payment of such debts.

I think it proper to notice the position assumed, and the case of Panaud v. Jones, not because the question involved is an open one, but because the sources of the learning by which the soundness of the propositions asserted in the case referred to, must be tested, are not accessible to every member of the profession, and because, upon a question so fundamental in the Spanish jurisprudence in relation to community property, we are not willing that there should be any room for doubt, as to the correctness of the former decisions of this court.

The judge who delivered the opinion in the case of Panaud v. Jones, was misled by detached passages of commentators, which doubtless came under his consideration, disconnected from the great body of the Spanish law on the subject, with which the passages referred to are not at variance. He also misunderstood the scope and meaning of the 14th law of Toro. That law is calculated to mislead, when considered by itself. It is expressed in the following terms: "Mandamos que el marido y la muger, suelto el matrimonio, aunque casen segunda o tercera vez, o mas, pueden disponer libremente de los bienes multiplicados durante el primero, o segundo, o tercero matrimonio, aunque haya habido hijos de los tales matrimonios o algunos de ellos, durante los cuales matrimonios los dichos bienes se multiplicaron; como de los otros sus bienes propios que no hubiesen seido de ganancia, sin ser obligados a reservar a los tales hijos propriedad ni usufructo de los tales bienes;" which may be translated thus:

"We command, that the husband and the wife, after the dissolution of the marriage, although they may marry a second or a third time, or more, may dispose freely of the property accumulated during the first, or second, or third marriage, although there may be children of such marriages, or of some of them, during which marriages the said property was accumulated, as

of their other individual property which is not ganancial, without being under any obligation to reserve to such children either such property itself, or the usufruct of it."

This 14th law of Toro means only, that upon the dissolution of the marriage, the surviving husband or wife may dispose of *their portion of the ganancial property ;* but it does not mean that the surviving husband or wife could freely dispose of *the whole* of the ganancial property; and it was never so understood by any commentator, or by any judicial tribunal of the country in which it was promulgated.

This 14th law of Toro was declared with particular reference to other principles and provisions of the Spanish law, which are said by some of the Spanish commentators to have been inherited, and which obviously were inherited by the Spaniards, from the Romans. There were certain classes or kinds of property which were said to be acquired by the husband and wife by lucrative title, (por titulo lucrativo,) and in respect to which it was provided, that in the event of the dissolution of the marriage during which such property was acquired, and the entrance of the survivor of the first marriage into a second marriage, such survivor was under obligation to reserve such property, so acquired by lucrative title during the first marriage, to the children of the first marriage. (See Ley 14, tit. 2, lib. 4, of the Fuero Juzgo ; see also ley 13, of the same title, of the same book, of the same Fuero.)

The 14th law of the second title of the 4th book of the Fuero Juzgo provided, that the mother should inherit jointly with the children, and in equal parts, the property of her husband, but in respect to the usufruct only ; and that in case she contracted a second marriage, she should lose the usufruct.

The 13th law of the same title, of the same book, of the Fuero Juzgo provided, that when one of the parents died, the survivor acquired the estate from the children, in respect to the usufruct only. Ley 1, tit. 2, lib. 3, del Fuero Real provided, that the mother is obliged to reserve for her children, three-fourths (las tres partes) of the arras which she received from her husband ; and if she had children of two marriages, the children of each

marriage should inherit the arras received from their respective fathers. (See also Ley 23, tit. 11, partida 4; and Ley 26, tit. 13, partida 5. And also the 19th, 20th, 21st, 22d, 24th, and 25th paragraphs of the Commentary of Llamas on the 15th law of Toro.)

The arras of the wife, or that property given to the woman by the man, in consideration of the marriage; the donations *propter nuptias*, or that property which either gave to the other, freely and without condition; the dower which the wife brought to the husband ; and inheritances, under certain circumstances, by either the husband or wife, from the children of the marriage ; constitute the property acquired by lucrative title, which was to be reserved for the children of the marriage, by and during which it was acquired. The 15th law of Toro provided, that in all cases in which women marrying a second time, were under obligation to reserve to the children of the first marriage the property received from the first husband, or inherited from the children of the first marriage,—in the like cases, men who shall marry a second or third time, shall be under obligation to reserve the property acquired by the first or second marriage to the children of that marriage; and that the same rules, in respect to women who married a second time, should apply to men who married a second or third time.

The Commentary of Llamas on this 15th law of Toro, in which he quotes the opinions and expressions of many other commentators, show in the clearest manner possible, the reasons and principles in which the 14th law of Toro had its origin ; and the substance of the whole is, that inasmuch as the community or ganancial property, is acquired by onerous title, as distinguished from lucrative title, the surviving husband or wife shall have the power freely to dispose of their portion of such ganancial property, without being under any obligation to reserve it for the children of the marriage *during which* it was acquired, in the same manner that they were required to reserve property acquired by lucrative title to the children of the marriage *by which* it was acquired. If the 14th law of Toro had not been

39

promulgated with particular reference to the other laws, which required a surviving husband or wife, contracting a second marriage, to reserve to the children of the first marriage, the property acquired by such marriage, by lucrative title, then it would have made no mention of second or third marriages. If the object of this law was to endow the surviving husband or wife with power to sell the whole of the ganancial property acquired during the marriage, then nothing need have been said about second or third marriages.

The 16th law of Toro provides, that where the husband shall bestow or bequeath to his wife anything, at the time of his death or in his testament, the thing so bequeathed shall not be charged to the wife, in the part which she is to have of the ganancial property.

In their commentaries upon this law, the Spanish authors discuss at great length the nature and extent of the wife's title or property, in the half of the acquisitions made during the marriage. Much criticism is lavished upon the words used in Ley 1, tit. 3, lib. 3, del Fuero Real, where it is said, " Toda cosa que el marido y muger ganaren o compraren, estando de consumo, hayan lo ambos por medio." Some of the commentators contend that the verb *hayan*, is used in the sense of vesting actual property or dominion in the thing spoken of. Others deny that the word has so large a signification; but all agree that upon the dissolution of the marriage by the death of one of the spouses, the ganancial property vests absolutely, one half in the survivor, and the other half in the heirs of the deceased partner. (See Commentaries of Llamas and Gomez on the 16th law of Toro.)

Section xiii. of the 5th Title of Febrero Reformado, treats of the rights and liabilities appertaining to the conjugal partnership. In paragraph 410, it is said, " The power of alienation which the laws concede to the husband, only continues during the marriage. The husband is prohibited from disposing, by testament, of that portion of the ganancial property belonging to the wife."

The 412th paragraph of the same section, speaking of the liabilities of the conjugal partnership, says, that they may be divided into two classes : first, those charges which arise during the existence of the partnership, and secondly, those relating to the obligations which ought to be discharged out of the effects of the partnership, after its dissolution. In the first class are enumerated, the necessary expenses of maintaining the family and the household, the dower given to the daughters, and the donations *propter nuptias*, made to the sons, &c. It is then said, that after the dissolution of the partnership, the common effects ought to be chargeable, in the opinion of some, with dower and donations of the same kind, made by one of the spouses after the death of the other; but this proposition is denied, and the reason given for denying its soundness is, that the partnership being dissolved by the death of one of the spouses, all its consequences cease. And in conclusion it is said, " The only charge to which the ganancial property is subject, after the death of one of the spouses, is the payment of the debts contracted during the matrimony, by either of them, provided they originated in the business of the partnership itself, and not in the private business of one of the partners." In paragraph 406 of the same work, section 12, the ganancial property, or what is ganancial property, is particularly defined. And afterwards, in the same work, in treating of the division of the ganancial property, between the surviving spouse and the heirs of the deceased, it is said in paragraph 2396, section 1, title xxxiii., " According to this law," referring to Ley 1, tit. 4, lib. 10, of the Novissima Recop., " all the property of which we spoke in paragraph 406, which is ganancial, ought to be divided between the survivor and the heirs of the deceased spouse."

In the Instituciones del Derocho civil de Castilla, by Asso and Manuél, in treating of the ganancial property, and the rights of the spouses in respect to it, those learned authors say, on page 62, chap. 5, tit. vii., libro primero, " upon the dissolution of the marriage, *the survivor may dispose of that part of the ganancial property which belongs to him or her,* without

being obliged to reserve it for the children;" and what is very conclusive upon the question under discussion is, that the authority cited by Asso and Manuél for the proposition just quoted from them, is Ley 6, tit. 9, lib. 5, of the Recopilacion, which is also the 14th law of Toro, upon which the doctrine asserted in the case of Panaud v. Jones, 1 Cal. Rep. 488, was mainly rested.

The Supreme Court of Louisiana was long distinguished for the eminent abilities of its judges, who made the most profound investigations into the whole learning of the Spanish law, and who explored thoroughly, every kindred system of jurisprudence, aided, too, by counsel, whose fame as civilians, extended throughout the whole country. The wonder would indeed be great, if that court, administering the Spanish law for very nearly half a century, should have remained all the while ignorant of one of its most important provisions, respecting the partnership which exists between husband and wife, as to their common property. That court has, time and again, decided the question under consideration, and the principle has always been asserted and never questioned, that the community of acquests and gains, ceases to exist at the moment of the death of one of the partners, with all the legal effects resulting from it; that each party to the community is seised of one undivided half of the property composing the mass, and that the survivor cannot validly alienate the share not belonging to him. In the case of Broussard v. Bernard, 7 Louisiana Rep. 216, the court said, "That a community of acquests and gains, as such, continues after the death of one of the partners, with all the legal effects resulting from such a relation, with authority in the husband, if he should survive, to be still regarded as the head of the community, with power to bind the common property by new contracts, and to alienate it without restraint, is a proposition so repugnant to all our notions of a community, and so subversive of first principles, that it cannot be for a moment admitted."

But I need not pursue this subject further. If the question was one about which there could be any doubt, or if the former decisions of this court needed any vindication, it would be mat-

Thompson v. Cragg.

ter of regret that the late Chief Justice was not here to perform a service to which his abilities and learning were so fully adequate. My only object has been, to express our confidence in the correctness of the former decisions of the court, and to make such references to sources of information, as will enable those who may desire to investigate these questions for themselves, to do so. I am quite conscious of my want of ability, and learning in the Spanish law, to present the subject in a full and clear light.

The judgment of the court is reversed, and the cause remanded for further proceedings, in conformity with this opinion.

Reversed and remanded.