DAVID YANCY ET AL. *v.* W. C. BATTE (NEXT FRIEND) ET AL.

COMMUNITY PROPERTY—IMPROVEMENTS—LIABILITY OF HEIR.—G and his wife, F, owned as community property a tract of land, which, in 1862, and after the death of F, was sold by G to Y. In a suit brought to establish title, and for partition by the heirs of F, through their next friend, against Y, and others claiming under him, the defendants pleaded that Y was a purchaser in good faith, who had paid for the land, and suggested under the statute valuable improvements made in good faith. They also relied as a defense on the fact that the plaintiffs had inherited from their father, G, who died in 1864, assets in excess of their interests in the land, and that they were thereby precluded from recovering, by reason of their father's warranty, until they had refunded to Y one-half of the purchase-money, with interest: *Held*—

1. In the absence of facts establishing an equitable defense, the heirs of F were entitled to recover one-half of the land acquired as community property during the marriage of G and F, and which had not been sold by G before the death of F.

2. The statute authorizing the defendants to recover pay for their improvements (Paschal's Dig., 5300) does not apply in this case, as it would where the plaintiff recovers the entire tract of land. That statute was designed to protect the defendants from losing their improvements without compensation, but does not entitle them to pay for their improvements while retaining them on partition of the land. Neither was the statute designed to give defendants the right to object that the land should be so divided, if practicable, as to give to them the part they had improved.

3. The case being submitted to the jury on special issues, it was proper to instruct them to find, not only what estate of their mother the plaintiffs had inherited, but what portion of it had been received by them.

4. The responsibility of the heir for the debt or covenant of the ancestor, is to be measured, not by the amount of the ancestor's estate which vested in him, but by the amount actually received.

5. At common law, the liability of the heir did not exceed the lands inherited.

APPEAL from Titus.   Tried below before the Hon. James H. Rogers.

July 2, 1873, Mary A. Grigg, Richard B. Grigg, and John H. Grigg, by W. C. Batte, their next friend, brought suit in the District Court of Titus county against David Yancy, Sr., W. H. C. Yancy, David Yancy, Jr., and L. W. Yancy, for one half interest in a tract of 1,000 acres of land claimed by the defendants.

The plaintiffs alleged, substantially, that they were the only children of H. C. Grigg and his wife, Mary A. Grigg, who intermarried in 1850; that on August 23, 1851, said H. C. Grigg bought and acquired title in the land sued for; that they immediately moved upon the place, and occupied it as their homestead; that they made large and valuable improvements thereon, a farm of 300 acres, dwellings, cotton-gins, &c.; that in 1858, Mary A. Grigg, mother of plaintiffs, died intestate; that a large quantity of community property passed into the hands of the surviving husband, and that the community was not indebted; that in 1859, H. C. Grigg married a second time, and continued to reside upon said land until January 22, 1862, when he, joined by his second wife, sold the said tract to the defendant David Yancy, for $4,750; that from that date said David Yancy and the other defendants had occupied the same, claiming the whole tract, taking and using the rents, &c.; that plaintiffs had never received anything from the estate of their mother.

Prayer was for partition, and for damages in rents for half the said property.

The defendants pleaded not guilty; purchase and payment of purchase-money in good faith from H. C. Grigg, in possession, and having the legal title; suggested good faith and permanent improvements; specially pleaded that plaintiffs inherited property from their father largely in excess of the community interest of their mother in the land sued for, claiming protection of the warranty by the father in his deed executed 22d of January, 1862, to defendant David Yancy, Sr.

In replication, plaintiffs alleged that they had received no assets from their father's estate, and that the consideration paid their father for the land was in Confederate money.

The testimony adduced by the plaintiffs was as follows:

1. Deed by W. C. Batte to H. C. Grigg, of date August 23, 1851, for the land in controversy, in consideration of $1,500 recited as paid.

2. Deed from H. C. Grigg and his wife, Rebecca V. Grigg, to David Yancy for the same land, of date January 22, 1862, in consideration of $4,750 recited as paid. Deed with covenant of general warranty.

3. W. C. Batte testified that the plaintiffs, Mary A., Richard B., and John H. Grigg, are the only children of H. C. Grigg, deceased, and also the only children of Mary A. Grigg, the first wife of H. C. Grigg; and that they are the children of the first coverture of H. C. and Mary A. Grigg; that said Mary A. Grigg was a Miss Tucker, and that after their marriage, in 1851, and after they had permanently settled in Texas, the said H. C. Grigg purchased of witness the tract of land in controversy at the price of $1,500, said land being then unimproved; that Grigg and his first wife and one of the plaintiffs, then an infant, immediately entered upon said land, and occupied it as their homestead; made large, permanent, and valuable improvements thereon, to wit, a two-story framed dwelling-house, well finished, kitchen and necessary out-houses, and tenement houses for slaves, stables, cribs, &c., a farm of 300 acres, cleared, fenced, and in cultivation; that said Grigg and his first wife continued to reside on and use said place as their homestead—the other two plaintiffs being born on it—until August, 1858, when said Mary A. Grigg, mother of plaintiffs, died on the place; that long before her death the fifteen hundred dollars purchase-money of the place had been fully paid off and discharged to witness by said H. C. Grigg.

After the death of said Mary A., the mother of plaintiff, said H. C. Grigg and his children (the plaintiffs) continued to

reside on said place as their only home; that in 1859, about a year after said Mary A. died, H. C. Grigg went on a visit to Virginia, (borrowing money to go on,) and there married his second wife, Rebecca V. Grigg, and he brought her to his said home in Texas, where they and his three minor children resided as their home until January, 1862, when he and his said second wife made a deed for the place to the defendant David Yancy. Soon afterwards, H. C. Grigg left the State as a soldier, and in the year 1863 he died in Mississippi. He left no children by the second marriage. Plaintiffs, at his death, were left in charge of their step-mother, who took them to Virginia, the fall of 1863. The widow and one of the plaintiffs are still in Virginia; the other two have returned ·to Texas, and have been living at witness' house. The oldest is a confirmed invalid, and none of them have any means of support whatever, except that furnished by the charity of their friends. They (nor any of them) have not received anything from the estate of either parent.

David Yancy paid for the place after Grigg left the State to go to the war, and paid in Confederate money to the wife, R. V. Grigg.

There was no administration on the estate of Mary A. Grigg, and none on that of H. C. Grigg, until after the war was ended.

When Mary A. Grigg died, the estate of herself and said H. C. Grigg was solvent, and free of debt. After his first wife died, H. C. Grigg became rapidly involved in debt; borrowed large sums of money; expended a great deal in his visit to Virginia, and otherwise. In 1859 and 1860, he borrowed of witness, and others, large sums, the amount of which witness cannot state.

When H. C. Grigg died, there was no estate of the second community; and his whole estate, both separate and community, of both marriages, was insufficient to pay his outstanding indebtedness..

A portion of the money paid by defendant Yancy to Mrs.

Grigg, as much as $3,000, as witness is perfectly cognizant, was used by her to pay debts of her husband, incurred in 1859 and 1860; only $400 or $500 thereof were taken by her to pay her expenses, and the expenses of plaintiffs, in traveling to Virginia.

No inventory or appraisement of the first community estate was ever filed.

After H. C. Grigg went to the army, and at the time of his death, his estate was going rapidly to waste. His family lived at a place on White Oak as their home. The stock, carried there from the old place, consisting of cattle, hogs, &c., soon died, and became lost. The crops were wholly used to maintain the place, except 30 bales of cotton, which witness took possession of, at the close of the war, to save it from destruction. Said cotton was applied, in part, to the payment of just debts of said H. C. Grigg. It brought 17 cents per pound, and did not pay the entire indebtedness of the estate, which is still in debt. There are no assets of the estate, except the place on White Oak, the second homestead, which is subject to overflow, and not worth paying taxes on.

Cross-examined: Witness stated there were three negroes on hand at H. C. Grigg's death, his separate property; seven or eight received by his first wife, and five or six by his second wife. Five were men, one a common plantation blacksmith. The average value of the men was $1,000 each; the average of the rest, $200 each. Witness could not estimate the amount of debts owed by Grigg at his death. Witness paid debts to Darley, to Hays, and to others; could not tell how much. The horses and mules on hand were worth $60 or $70 each, and cattle $5 per head.

Administration was opened on the estate in 1868. Oath and bond were filed by W. P. McLean, as administrator. An account for $200 was probated, which is still unpaid.

Plaintiffs closed.

David Yancy, one of the defendants, testified that he came to Texas, in January, 1862, in search of a home. Was a

stranger in the country. H. C. Grigg, learning his business, offered to sell him the land in controversy. He examined the premises. Was at Grigg's house; saw his wife and children there. Agreed to buy at $4,750. Grigg and wife executed the deed to witness for the land (the same read in evidence by the plaintiffs).

Witness believed he was getting a good title, and did not know at the time of his purchase that Grigg had ever had any other wife than the one he then had, and never heard of it until some time afterwards. Witness entered upon the land in controversy at the time of purchase, and made his first crop that year. The purchase was made in good faith. The witness testified as to the improvements made by him and by the other defendants, who held by purchase under him, and as to the value of said improvements, &c.

Witness paid $4,000 of the purchase-money in the spring of 1862, and the remainder ($750) in the summer following. The land without improvement was worth from one to two dollars per acre.

David Yancy, Jr., testified in substance as did the former witness.

The defendants read in evidence an extract from plaintiffs' petition, as follows: "The said H. C. Grigg died in the year 1863, leaving his said children in charge of their said mother-in-law, who, having no children by said H. C. Grigg, abandoned the State of Texas, and now resides in the State of Virginia. Petitioners further show, that at the time of the death of the said H. C. Grigg, as above described, he had several slaves, and horses, mules, teams, wagons, cattle, hogs, provisions, corn, and some fifty or sixty bales of cotton, and many other articles of personal property, all of which were left in this State."

W. P. McLean testified that he had done nothing as administrator of H. C. Grigg but to qualify and give bond. He filed no inventory, collected nothing, nor did he attempt to do so. He paid no debts. A claim of one or two hundred

dollars had been probated, which is still unpaid. He had never paid tax on the land.

I. C. Sherry, clerk of the District Court, produced the record of the administration by McLean. It showed that he took the oath and gave bond as administrator of Grigg's estate in 1868. No inventory or appraisement appeared of record.

Defendants then read, from the records in the District Court of Titus county, a decree, in which William C. Batte was plaintiff, *v.* W. M. Witt *et al.* defendants, *v.* W. P. McLean, administrator of H. C. Grigg, intervenor, of date December 10, 1870, in which it was adjudged—

1. McLean, as administrator of Grigg, do make, execute, and deliver to said Witt a good and sufficient deed of conveyance to certain lands described in the pleadings in said case.

2. That said McLean, as administrator of Grigg, recover of the defendant Witt the sum of $2,221.45 in gold and silver coin, principal and interest.

3. Enforcing the vendor's lien for said sum on 320 acres of land, (described,) and ordering sale.

4. Awarding to Batte, vendor of Grigg, judgment against McLean for said sum, directing McLean to pay over the same, when collected, to Batte, less costs over expenses.

The defendant closed.

In rebuttal, plaintiffs introduced N. C. Lindsay, who testified that in 1862, a very short time after defendant David Yancy, Sr., took possession of the place, and before he had placed any improvements thereon, witness, while riding with David Yancy, Sr., one of the defendants, informed him that "the plaintiffs were children of a former wife of H. C. Grigg, and if he didn't mind, he had bought a lawsuit." Plaintiffs read their whole petition in evidence, explanatory of the extract read by the defendants.

Special issues were submitted to the jury; which issues, and the responses thereto by the jury, are sufficiently shown in the opinion.

The verdict, however, found substantially for the plaintiffs, and that defendants, as possessors in good faith, were entitled to pay for improvements; finding value, &c.

The court rendered judgment for plaintiffs for half of the tract of land described in the petition, awarding partition; appointed commissioners to make partition; ordered the commissioners, in making partition, to set apart, if possible, to each of the defendants, his improvements; directing the commissioners, in the event partition could not be so made, to report the facts to the court, for further action.

Motion for new trial was overruled, and defendants appealed. The errors assigned are discussed in the opinion.

*J. D. McAdoo* and *Culberson & Armistead,* for appellants.—The findings of the jury were, that the appellants purchased and paid for the whole of the one thousand acres of land in controversy in good faith, and put, in good faith, very valuable improvements thereon, largely in excess of the value of rents. They also found, that a very large amount of property of the father of plaintiffs was on hand (never administered) at the time of his death; that this property went into the hands of their friends who had care of them, and became squandered and lost by the fortunes of the war.

We hold—

I. That the statute on the subject of the right to recover value of improvements in good faith, applies as well to a case like this, where a plaintiff recovers a part of the land (a joint, undivided interest) by reason of a secret equitable title, as to a case where the whole land is recovered. Certainly, the law does not design to leave a party who is ousted of the right to a part of the land, under a greater disadvantage than one whose whole title fails. And yet the court below so treated the appellants in this case. This case was treated in the decree as a suit merely for partition. Of what value were the findings of the jury as to value of improvements, if they were to be ignored in the decree? If the purchase and im-

provement be in good faith, then the defendant in no way shall be disturbed in his possession until the value of his improvement be paid. (Paschal's Dig., art. 5300.)

II. The court erred in submitting the twenty-first special issue, and in the decree under it. That issue was doubtless understood by the jury to be an inquiry as to whether the appellees, (little children,) at the death of the father, took actual personal possession of his estate, and hence found that they had received nothing. Is not the possession of the natural guardian and next friend of minors, the possession, in a legal sense, of the minors themselves ? Should not the jury have been instructed what constituted possession ?

It certainly cannot be maintained, that in order for a purchaser from the ancestor, with warranty, to require the heir to account, before he recovers, for the value of a homestead and other lands attached, and a number of slaves and other property on hand, while the heir, a minor, lives on the place where all the property is, simply because, before the warrantee fails, the property so inherited is squandered or destroyed by the fortunes of war years afterwards. The appellees inherited; the property was on hand; it was in possession of those who had personal care of them; and it was their misfortune, and not the fault of the appellants, if this property was lost, before their father's warrantee failed.

Such an equity as is shown by the testimony and the findings of the jury in this case, cannot certainly sustain the decree rendered in the cause.

*George T. Todd,* for appellee.—Half the property vested *eo instanti* in plaintiffs. (Wilkinson *v.* Wilkinson, 20 Tex., 244; Walker *v.* Young, 37 Tex., 519; Wright *v.* McGinty, 37 Tex., 733.)

The court will take judicial notice of the manumission of the slaves, by war. Plaintiffs might be held to account for what they received from their father's estate; and unless they had received from him enough to reimburse them in

full for their interest inherited from their mother, they are entitled to recover. (Burleson *v.* Burleson, 28 Tex., 383; Walker *v.* Howard, 34 Tex., 513.)

Here plaintiffs have shown that they absolutely received nothing from their father's estate, and that all said estate was absorbed by his creditors for debts contracted after the death of his first wife.

Though the court below has declared appellants to be entitled to their improvements, yet the facts show them to be possessors *mala fide*, with actual notice of plaintiffs' claim long before the payment of the Confederate money for the land.

Decay and deterioration, instead of permanent improvement, is shown to be the true condition of the land.

The debts of H. C. Grigg, paid by his last wife, were just and valid, and subsisting when paid; and the fact that they were not paid through administration, cannot affect the justice of the payment, or the fact that plaintiffs received nothing.

GOULD, ASSOCIATE JUSTICE.—Mary A. Grigg, Richard B. Grigg, and John H. Grigg, minors, brought this suit, by their next friend, W. C. Batte, to recover and have partitioned an undivided half of 1,000 acres of land, claiming that it was the community property of their deceased parents, H. C. and Mary A. Grigg, and that at the death of their mother, in 1858, they inherited her community interest. They allege an attempted conveyance, in 1862, by their father, joined by a second wife, Rebecca, to David Yancy, Sr., of the entire tract, and that the other defendants, the sons of David Yancy, claim parts of the tract through said David.

The defenses relied on were purchase and payment and valuable improvements, in good faith, and that the plaintiffs had inherited from the estate of their father assets in excess of their interest in the land claimed, and that by reason thereof, and of the warranty contained in the conveyance of their father to David Yancy, Sr., plaintiffs were precluded from

recovering until they had refunded to said David one-half the purchase-money paid by him, with interest.

On the trial, the court submitted numerous special issues to the jury, and from their findings it results, that the land was the community property of the first marriage; that the mother died in 1858, and the father, after contracting the second marriage and selling the land, as alleged, died in 1864, leaving, at his death, on hand, of property acquired during coverture of his first wife, ten negroes, valued at $2,000, and cattle, horses, &c., of the value of $970; of property of the last community, cotton and hogs, of the value of $3,920; and of the separate property of H. C. Grigg, three negro men, valued at $1,000 each. They find that no debts of the estate of H. C. Grigg have been paid since his death, and that only $200 had been probated against his estate. In response to the issue, (twenty-first,) " What amount of the separate or community estate of H. C. Grigg have his children actually received from his estate since his death, and how much of this came from his estate acquired after the marriage to the mother of said children and before her death ?" the answer is, " We find plaintiffs in this cause have received nothing from their father or mother's estate." The issue was submitted separately, as to each of the defendants, whether he had made valuable improvements, in good faith; and the finding is, that each defendant has made improvements, specifying the improvements and fixing their value, which is, in each case and in the aggregate, in excess of the amount of rent, also found.

On these findings, the court entered up judgment, that the plaintiffs recover of the defendants an undivided one-half interest in the land sued for, and that their title to the same be established, decreeing that the tract of land claimed by each defendant be partitioned between the plaintiffs and the respective defendants according to quality and quantity, allotting to the plaintiffs one-half and to the defendants the remainder of said land, and allotting to each defendant the improvements

made thereon by him, (specifying the improvements of each,) if the same could be done " in justice to the rights of plaintiffs in said land." After naming the commissioners, directing them to report at the ensuing term of court, and instructing them that the rights of the plaintiffs and defendants, to the improvements made prior to the sale by H. C. Grigg, were equal, the decree proceeds : " That if said commissioners shall set apart to the plaintiffs any part of the improvements made by either of the defendants, that such part shall be reported to this court, for its further orders."

There was a motion for new trial, and a motion to reform the judgment rendered, both of which were overruled.

The first error assigned, is that the findings of the jury were insufficient to support the judgment rendered, or any judgment.

The findings established that the land was acquired during the marriage of the parents of plaintiffs, and was on hand, undisposed of, at the death of their mother. This was sufficient to entitle plaintiffs to recover, unless the findings on other issues established some equitable defense. Such is believed to have been the doctrine recognized in this court from so early a period, and in so many cases, that we do not regard it as now open to controversy. (Duncan *v.* Rawls, 16 Tex., 501; Parker *v.* Parker, 10 Tex., 96; Robinson *v.* McDonald, 11 Tex., 390; Jones *v.* Jones, 15 Tex., 143; Wilkinson *v.* Wilkinson, 20 Tex., 244; Thompson *v.* Cragg, 24 Tex., 600; Magee *v.* Rice, 37 Tex., 501; Primm *v.* Barton, 18 Tex., 206; Monroe *v.* Leigh, 15 Tex., 519.

But, instead of following the assignment of errors, it will suffice to notice the two questions which are alone discussed in the brief of appellants' counsel, both of which arise out of other findings of the jury.

It is claimed that the jury found improvements, in good faith, by defendants largely in excess of rents, and that, under the statute, the defendants were entitled to pay for their improvements, before their possession of any part of the land

could be disturbed. (Paschal's Dig., art. 5300.) The objection urged, is not that it is impracticable to make the partition so as to give defendants their improvements, nor that the judgment is incomplete in failing to prescribe distinctly the rule to be applied in case that some of the improvements of defendants had to be allotted to plaintiffs. The position taken is, that the statute applies just as it does in cases where the plaintiff recovers the entire tract. But it seems too plain for argument, that the statute was designed to protect the defendant from losing his improvements without compensation. It was never designed to entitle defendants to pay for improvements, and, at the same time, to retain them; nor was it designed to give defendants the right to object that the land be so divided, if practicable, as to give to them the part which they have improved. If such a partition be impracticable, and it be necessary to dispossess the defendant, the statute would protect him. But there is nothing in the statute to prevent the partition being made, as in other cases of partition between joint owners. The decree of the court follows the course marked out by Chief Justice Hemphill in a similar case, and is not erroneous in the point complained of. (Robinson v. McDonald, 11 Tex., 388.)

It is claimed that the findings of the jury show that the plaintiffs inherited property from the estate of their father in excess of the one-half of the purchase-money, with interest, paid to their father for the land by David Yancy, Sr., and that, by reason of that fact and the warranty of their father, they were precluded from recovering the land until they had repaid one-half the purchase-money, with interest. It is contended, that as the findings of the jury establish that H. C. Grigg, at his death, left separate and community property to a considerable amount, and that this property had not been appropriated to pay debts of the estate, only $200 of debt being probated, that it necessarily followed that the plaintiffs had inherited a considerable amount from said estate. This view of the findings disregards the further finding, that the plain-

tiffs actually received nothing from the estate of either father or mother,—an issue, it is said, which should not have been submitted to the jury. The presumption which might arise from the other findings, is rebutted by the finding that nothing was received,—an issue, under the facts of the case, proper to be passed upon. In this State, it is true that the entire estate vests at once in the heir, on the death of the ancestor; but it is also true, that administration may intervene, and the estate having been absorbed in the course of administration, may never reach his hands. (Paschal's Dig., art. 5488.) So, as in this case, the property on hand at the ancestor's death may be wasted or destroyed by the fortunes of war, or appropriated, without administration, to payment of just debts, and never reach the hands of the heir, so as to become assets chargeable to him. We think it clear, that, in this State, the responsibility of the heir for the debt or covenant of his ancestor is to be measured, not by the amount of the ancestor's estate which vested in him, but by the amount received. (Montgomery *v.* Culton, 18 Tex., 749; The State *v.* Lewellyen, 25 Tex., 797; Holman *v.* Criswell, 15 Tex., 399; Ansley *v.* Baker, 14 Tex., 607; Paschal's Dig., art. 1332.)

At common law, the liability of the heir did not exceed the lands inherited. (2 Blackst., 243; Rawle on Cov., 579.)

The issues submitted were not, perhaps, exhaustive of the case. Indeed, on the question last discussed, no issue was submitted as to the fact of warranty,—a fact patent on the face of the deed in evidence, it is true, but one which should either have been found by the jury, or agreed upon by the parties. But if there were other issues which should have been submitted, it does not appear that any were suggested; and if the evidence seems insufficient to support the findings on some immaterial points, that constituted no good reason for granting a new trial.

Because we find no material error, the judgment is affirmed.

AFFIRMED.

MOORE, ASSOCIATE JUSTICE, (dissenting.)—It cannot have escaped the attention of those who have taken note of its decisions, that, since the present members of the court have occupied the bench, there has existed a decided difference of opinion between the majority of the court and myself, in respect to the law applicable to the class of cases to which this action belongs. When the opinion of the court affirming the judgment of the District Court in this case was read, I made an oral statement of some of the grounds of my dissent from this judgment. In doing so, I had occasion to say, that, in my opinion, there probably existed in the minds of my brethren, as well as that of many members of the bar, a misconception as to the points heretofore decided by this court in this class of cases. That it could not, as I thought, be justly said that the court had, or in fact had ever, attempted to settle the general and fundamental principles by which controversies between the heirs of the deceased wife and purchasers from the surviving husband, of community property, were to be determined. That the cases which were supposed to have done so, were decisions of the particular phase of the question suggested by the record, or most prominently presented by the counsel of the parties. That while in several of the cases the power of the surviving husband to sell community property for the payment of debts with which it was properly chargeable was fully recognized,—which principle, if properly applicable to the facts as shown in this case, should lead to its reversal,—still there were other questions, of equal or greater importance, for the determination of the court in such controversies, which, as I thought, were still undetermined; or, if determined, this had certainly not been done "on solemn argument and mature deliberation." (1 Kent's Comm., 476.) And, therefore, we were not bound to adhere to and follow such decisions if, on examination, they proved to be unsound, as well as contrary to public policy, and absolutely ruinous to the best interest of society in general.

The questions to which I refer, involve the determination of the extent and character of the wife's interest in the community property, which, I insist, is altogether of an equitable character, and especially so in respect to land conveyed by deed to the husband; that the right of the surviving wife in the community is subordinate to that of the executor or administrator of the deceased husband; so must that of the heirs of the wife be to the proper and necessary appropriation of it by the surviving husband to pay the debts with which it is justly chargeable, the heirs being only entitled to an interest in the remainder of the community property after discharging all liabilities against it. The heirs can demand no part of the community property from the surviving husband until the debts for which the community estate is liable have been paid, or a reasonable time has elapsed for the husband to have settled them. Ordinarily, their proper course would be to file a bill against the surviving husband for an account, when the court could settle and adjust their mutual equities. But when the heir of the wife sues a purchaser from the surviving husband, the burden should devolve on him to prove his right to, or interest in, the property claimed by him. Again, whatever may be the equitable rights of the heirs of the wife, if the legal title is in the husband, as I think it unquestionably is where land is conveyed to the husband by deed, it passed to the purchaser by the deed of the husband, the burden of proof is upon the heirs to show that the vendee is not an innocent purchaser, &c. And, again, if the purchaser from the husband did not get the legal title, if he shows that he is a purchaser for value from the party apparently holding the legal title, and having authority to sell, without notice of the rights of the heirs of the wife, his equity is superior to that of the heirs, and they are not entitled to a recovery.

In announcing my dissent from the opinion of the majority of the court, I stated, if I found the time to do so, after the other cases of like character which were before us had been

disposed of, I would file a written opinion exhibiting the grounds of my dissent, and the views I entertained upon the questions presented in this record, in which I would endeavor to review the cases referred to by the court as decisive of this case, and which, I thought, seem to have been taken for granted as definitely settling all the questions involved in· suits by the heirs of the deceased wife against purchasers from the surviving husband of property which, at the death of the wife, formed part of the community property of the spouses.

Although all the cases to which I referred have not yet been disposed of by the court, I will now undertake to per-. form the task I allotted myself. I do so without further delay, as it seems, from what is said in a recent opinion, that the majority of the court, in disposing of the other cases, may regard the questions which I propose to consider as no longer open for discussion, and it is certainly not my purpose or desire to persist in the discussion of questions which the court regards as definitely determined, beyond a clear and distinct announcement of my views and conclusions, when I deem the question of sufficient importance to require me to do so. For this reason, it would, I think, be improper to longer withhold what I wish to say on the subject.

In disposing of the case to which I refer, (Johnson *v.* Harrison,) the court says: "In the recent case of Yancy *v.* Batte, decided at the present (Tyler) term, the majority of the court held, that the land was community property at the death of the parent being established, the children of the deceased wife were entitled to recover, unless some equitable defense was made. It was said, 'that such is believed to have been the doctrine recognized in this court from so early a period, and in so many cases, that we do not regard it as open to controversy.' That opinion was supported by a bare citation of cases; and it is proposed now to take a view of those cases, for the purpose of seeing how they justify the position that the question should be treated as settled."

And after reviewing the cases, the court says: "After thus being again deliberately decided, in accordance with the original decisions, do not the rules of law require the question to be regarded as settled?"

My name, while at the bar, having been entered in that case as counsel for one of the parties, during the absence of his real counsel, I did not participate in its decision. I had, in fact, however, nothing to do with the preparation or argument of the case. The *quasi* connection which I had with it, is a sufficient reason why I should refrain from all comment upon it. The opinion of the court shows, I think, that it was intended, in part, at least, as a supplement to the opinion previously pronounced in this case, and is fully as applicable to it as to the case in which it was pronounced; and, in that view, I do not hesitate to refer to it.

The manner in which the majority of the court treat the questions upon which I find myself unable to concur in their conclusions, and as to which I may possibly, to some extent, dissent from opinions intimated by our predecessors, warrants me in supposing that the court have referred, in the opinion in this case, or in that of Johnson *v.* Harrison, to all of the former decisions of this court which bear upon these questions, or that are deemed material in support of their conclusions. I shall, therefore, endeavor to present the questions raised in each of these cases, and the points actually decided in them.

Before doing this, it may be well for me to say, that the supposed policy or impolicy of the community system is not a matter for consideration by this court. Our duty is limited to the determination of the nature and legal incidents of the system, and the consequences resulting from it, as between parties in the cases coming before us. I have never doubted, and do not propose to controvert, that the wife has a vested interest in the community estate. But this interest, I hold, is in the community property as an entirety, and not in each specific item of property of which it consists. Nor do I con-

tend that the community estate continues for a single instant after the dissolution of the marital relation between its constituents. Nor have I ever denied, that on the death of the wife, her heirs take by descent all her interest in the community. I insist, though, that the interest which they acquire is one-half of the property remaining after the payment of debts and liabilities justly chargeable against the community. If the wife survive the husband, her title and right to her share of the community estate is subordinate to that of the executor or administrator of the husband. Certainly, the rights of the wife and her heirs are in no way superior to those of the husband and his heirs. Unless they are, the interest of the wife must also be subordinate to the power vested in the husband to pay and discharge the liabilities for which the community is justly bound. I also maintain, that, from the nature of the interest of the wife, it cannot be claimed that a legal title vests in her to any particular piece of property of the aggregate community estate, unless it had been conveyed to her by a legal title. In such case, she would take the naked legal title; but the community would be entitled to the beneficial interest. And especially is there no vested legal title or estate in the wife in land conveyed to the husband. The heirs can get from their mother only such title as she had. If the legal title to a particular piece of property was not in the wife, her death would not divest it out of some one else, and vest it in her heirs. Again, I do not gainsay, where the heirs of the wife show a *prima-facie* right to recover from a third party property for which the husband has given a warranty deed, and the defendant sets up, in defense, that the plaintiffs have inherited from the father property equal in value to that for which they sue, the burden of proving his defense rests upon the defendant. I insist, however, where there has been no settlement of the community estate, and the heirs sue the purchaser for property which belonged to the community at the death of the mother, which has been subsequently sold by their father, that the burden

of proving the essential facts entitling the heirs to sue, or that the defendant is a *mala-fide* purchaser from the surviving husband, and especially when the legal title, or apparent legal title, was in the husband, devolves upon the plaintiffs.

In reviewing the cases referred to in the opinion of the court, I shall consider them in chronological order. I begin, therefore, with Parker *v.* Parker, 10 Tex., 85.

The children of Jesse Parker, by a former marriage, brought suit against the surviving wife and her children, to contest the will of their father. The main controversy relates to the doctrine of forced heirs, under the law then in force. The plaintiffs alleged, however, that a part of the land returned in the inventory belonged to the community existing between their deceased father and his first wife, and that, as heirs of their mother, they were entitled to one-half of it. The court disposed of this branch of the case with these remarks: "Unquestionably, the will of the testator can operate only on his own property. He can neither bequeath the separate property of his wife or heirs, nor her or their interest in their respective communities, though his bequest of the common property is valid to the extent of his interest in that community. If, after the payment of all charges against the first community, there be any residuum, the appellees are entitled to their respective shares; provided they be not barred by prescription, or other just cause." It is apparent, that this case holds merely that the heirs may recover their interest in their mother's community from the devisee of the husband, who evidently gets by the will no better title than the testator had; that their interest in the community was the residuum, after the payment of all charges; and until this residuum was ascertained they could not recover.

Robinson *v.* McDonald, 11 Tex., 385, is a suit on the bond of deceased husband for title to land belonging to the community of himself and his first wife. The legal title was conveyed to the wife. The plaintiff was the administrator of the husband, yet he made no effort to show whether there had

been any debts against the community, or, if so, whether they had been paid or were still outstanding. There was no proof that he paid a valuable consideration. By the deed to the wife, the plaintiff was charged with notice of her interest. The plaintiff was seeking to enforce an equitable title against a party holding the legal title, without establishing his equities. The court held, on the case shown in the record, that the plaintiff was entitled to a decree for one-half the land for which his bond called, which, it seems, was all that he insisted on in this court. It is not the duty of the court to make cases for litigants. It is sufficient if it decides the points which counsel make.

Jones *v.* Jones, 15 Tex., 143. This suit was brought February 13, 1854, by the heirs of the wife, against the administrator of their father, for their community interest of their mother in a league of land granted their father as the head of a family. The wife died September 5, 1837. The husband died in 1845, leaving only 1,414 acres of land unsold. For what purpose it was sold, or to what use the proceeds arising from its sale were applied, does not appear. The agreed facts, upon which the case was submitted to the jury, show that there was a community debt still unpaid, the amount of which exceeded the value of the land inventoried by the administrator. The court reversed the judgment of the District Court in favor of the plaintiff, and dismissed the suit. The court says: "To determine the issue, it will be essential that the character and extent of the legal rights of appellees, as heirs of their mother to the ganancial property, should be properly understood. On the death of the wife, her estate becomes entitled to one-half of the community property; but her heirs, the appellees, can claim and finally hold only such portion as may remain after payment of all just demands against this community. Febrero, in treating of the division of inheritances, declares that there must be deducted all legitimate debts which the husband, or wife with his permission, or both jointly, may have contracted on account of the con-

jugal partnership, and which must be paid out of the ganancial property; and that the residue only is divisible, and is what is called the inheritance."

Throughout the opinion, the rights, powers, and duties of the surviving husband, in settling the community or conjugal partnership, as it is aptly called, when dissolved by the death of the wife, are plainly analogized to those of the surviving partner in a commercial or other common-law partnership.

Stramler v. Coe, 15 Tex., 211, was an action of trespass to try title. The plaintiff relied upon a bond for title by the husband, James Price, dated September 17, 1835, and a deed from the husband, made May 6, 1853, after the death of the wife. This deed, however, made no reference to the bond. Defendant claimed by conveyances from the heirs of Mrs. Price, and proved that Price and wife moved on the land in controversy in 1847, 1848, or 1849, and resided on it until 1851, when Mrs. Price died; that she claimed the land as her homestead; that the heirs went on the land in January, 1851. The defendants contended that the bond was not a just liability against the community at the death of the wife, because it was barred by limitation, and had been previously repudiated by Price and wife, as was manifested by their entry upon the land, subsequent occupancy, and claim of it as their homestead. They also urged, that there was no proof that the deed was made in fulfillment of the conditions of the bond. Yet the court held the plaintiff entitled to recover. It says: "The conveyance of Price, after the death of his wife, being but the completion of a preëxisting arrangement made during the existence of the matrimony, must be held as valid as if made in the lifetime of the wife. As surviving partner, he had authority to perfect a transaction commenced during the partnership; and this rule is of special force and application in cases of conjugal partnership, in which there is a head that has the entire control of the affairs of the partnership, with no restraint, except that it

shall not be abused with fraudulent intent against the rights of the other partner."

The case of Bartlett v. Cocke, 15 Tex., 471, was an action by the heirs to recover land purchased from the administrator, for want of authority of the administrator to sell, and because of irregularities in the sale. None of the questions which we are here discussing were in any way involved in this case. On page 479, to which reference is made in the opinion of the court, it is said: "The sale was necessary for the payment of debts, and they have been paid by the proceeds; and it would be a scandalous iniquity to suffer an innocent purchaser to be entrapped and stripped of both money and land, giving the one over to the creditors, and restoring the other to the heirs. Such injustice can find no sanction in principles of law, fairly construed and administered, with a view to promote honesty and fair dealing." If the surviving husband has a general power to sell community property to pay the debts with which it is justly chargeable, unless the purchaser is bound to see to the application of the proceeds, to which we will advert hereafter, it is surely as iniquitous to strip the innocent purchaser, by giving the surviving husband the money, and restoring the land to the heirs. Where the purchase is from the administrator, the purchaser and those claiming under him get notice, with their title, of the nature and extent of the administrator's authority. When the purchase is from the surviving husband, the record and title deed under which he holds do not put the purchaser on inquiry, but lull suspicion, and aid to mislead him.

The case of Monroe v. Leigh, 15 Tex., 519, decides merely that the purchaser from the heir of the wife, when such heir has inherited more than the value of the land in controversy, cannot recover from one holding under a decree against his administrator for a specific performance of a parol contract of the husband before the death of his wife. The record does not show how or by whom the facts were developed, and the court does not say upon whom the burden of proof rests.

The next case in order, and the one mainly relied upon in support of the judgment in this case, and to negative the views which I have expressed, is Duncan *v.* Rawls, 16 Tex., 478. And I frankly admit, that if every deduction which may be drawn from mere general observation of the judge delivering the opinion of the court, or if every point which might have been considered by the court or suggested by counsel should be regarded as definitely decided, though not adverted to in the opinion, I would have to admit that several of the questions which, I insist, are still undecided by this court, have been ruled upon, whether the ruling upon them is such as the court should follow or not; but I do not understand this to be the proper rule by which the judgment of a court is to be interpreted. The opinion of the court, as I think, is only authority in other cases on the points which the opinion announcing its judgment shows the court considered and determined.

Let us now see what was decided in this case, Duncan *v.* Rawls. The suit was commenced on the 9th of December, 1847, by Aylett B. Rawls against John Duncan, for the recovery of one-half of a league and a quarter of land granted to Daniel Rawls as his headright. The plaintiff alleged that he was the sole surviving heir of Milly Rawls, the wife of Daniel Rawls. That she died in the summer of 1833, and that there had been no administration on her estate. The defendant, it appears, bought the land from Rawls in the fall of 1835, and the same year took possession of it, and continued in possession until the commencement of the suit. A demurrer to the petition was overruled, jury waived, and the court below gave judgment for the plaintiff. This is the substantial statement of the case as furnished by the reporter. Whether all debts with which the community estate was chargeable had been paid prior to the sale of the land by the surviving husband, or whether the defendant was an innocent or *mala-fide* purchaser, cannot be told. Now, the only points made by counsel for the reversal of the judgment, or

discussed in the opinion of the court, are: 1st. That the demurrer should have been sustained, because, under the decisions of Louisiana, the heir of the deceased wife, who claims one-half of the community property in the hands of a purchaser from the husband, must first show that the community has made acquests and gains; and this can only be done by a settlement in a regular course of administration. 2d. That plaintiff was barred of his action by prescription or limitation.

The first question is merely suggested in the brief of counsel for appellant, and evidently the court gave it but slight consideration. It says: "The community was primarily liable for its debts and charges, but it does not follow that the fact as to indebtedness could be ascertained only by administration. This may furnish more conclusive proof, but without administration there may be satisfactory evidence that no debts ever existed, or, if so, that they have been paid." This disposes of the question before the court, which was merely whether the petition was sufficient on a general demurrer. There is in the opinion, I admit, one or two general and indefinite expressions, which seem to indicate that the learned judge by whom it was delivered supposed or took it for granted that the burden of proof that there were debts against the community, or that the land was sold for the payment of them, if there has been great delay by the heir in bringing his suit, rests upon the purchaser. But there was no such point before the court. The evident defect of logic, in imposing the burden of proof of the existence of debts upon the purchaser from the husband, because of the delay of the heir in bringing the suit, rather than the length of time which may elapse from the death of the wife to the date of the sale, is too obvious for comment. The attention of the court, it is apparent, was attracted mainly to the other question, to which the argument of the counsel was almost exclusively devoted. It, however, has no bearing upon the present discussion.

Primm *v.* Barton, 18 Tex., 206, decides that the husband may convey land after the death of the wife, in pursuance with their previous contract, although there had been a forfeiture of the contract by the purchaser prior to the death of the wife; and if the heir seeks to impeach or set aside such conveyance, he is held to strict proof of the facts upon which it is to be done. It was admitted that the community property was unincumbered by debts or liabilities of any kind at the death of the wife. It was not shown that the heirs got any part of the purchase-money paid the husband after the death of the wife. The court held, that the deed of the husband " vests such title to the land as cannot be gainsaid by the heirs of the wife, unless it be shown, by clear proof, that the sale was made and perfected to defraud the wife or heirs." "And," continues the judge, " there is not a scintilla of evidence that there was any such fraudulent intention, on the part of the father, throughout the transaction. The wife having joined in the bond, is proof that the sale was not made by fraud to injure her; and there cannot be a shadow of pretense, under the facts in evidence, that there was any wrong intended against the plaintiff by her own father, in honestly fulfilling his agreement. The maxim, that ' fraud cannot be presumed,' applies with peculiar force to cases of this character, in which there is an attempt by a son to invalidate the deed of his father, acting not only for himself, but virtually for his minor child, and whose interest, it must be presumed, would be guarded by him with all the solicitude, watchfulness, and anxious care of fatherly affection."

. Maxwell *v.* Guyton, 20 Tex., 202, holds, that if the heirs of the deceased wife have been advanced by, and inherited from the father, to the extent of the value of their inheritance from their mother, they cannot recover their mother's community interest in property disposed of by their father. There is nothing in this case tending to show upon whom the burden of proof rests to raise a presumption of the father's want of authority to sell. I admit, when this is done, it is, on princi-

ple, incumbent on the defendant to establish a defense of the character indicated in this case.

Wilkinson *v.* Wilkinson, 20 Tex., 237, was submitted to the court below upon an agreed statement of facts, which evidently was not calculated to invite a decision of the questions which, I insist, have not been decided, though some of them are suggested in the brief of one of the counsel. Be this as it may, the court did not undertake to pass upon or determine them. The chief justice, who delivered the opinion, says:

" Two questions arise in this case: 1st. Does the land acquired by the husband, the head of a family, under the act of January 4, 1839, form a part of the community property? 2d. Had the wife, in the present case, acquired such an interest in the land in controversy as, at her death, an estate therein descended to her heirs ? "

Almost the entire opinion is devoted to the first of these points. The pith of all that is said upon the second is contained in two lines, asserting that the wife had such an interest as would descend to her heirs. Certainly, it will not be insisted, that a solemn determination of the most important question, in respect to the title to land throughout the State, which has ever been before the courts, is to be decided by the reporter from the bare skeleton of facts found in the record, and this brief announcement by the court.

We come next to the case of Thompson *v.* Cragg, 24 Tex., 600. This was also an action of trespass to try title. The land in question was the headright of Prior A. Holder, who emigrated to Texas in 1833, and, as a married man, received a grant for a league and labor of land, one-half of which he gave for its location, surveying, &c. The wife, Julia Holder, died in 1836. The plaintiffs claim her right in the community. On the 24th of April, 1837, Prior A. Holder sold the remaining half of the league to W. D. Thompson & Co., and executed a bond for title. · In November, 1837, Holder died. In March, 1847, Thompson and Smith brought suit, on Hold-

er's bond to W. D. Thompson & Co., against his administrator and William and Martha Jane Holder, his minor children, who were also the heirs of Julia Holder. But as the court held they were not sued or brought before the court in this latter capacity, on the final hearing, the court, by its judgment, vested in Thompson and Smith "all the interest that the heirs of said Prior A. Holder may have had in and to the lands set apart" to the plaintiffs by the judgment. The plaintiffs acquiesced in this judgment, and accepted the decree of the interest of the heirs of Prior A. Holder in the land as a discharge of their bond. If they claimed any part of this land against the heirs of Mrs. Holder, it was not asserted in their suit, or recognized by the court in its decree. Their rights under this bond were, after this judgment, *res judicata.* Thus stood the matter until February 11, 1857, when, as previously stated, the heirs of Mrs. Holder brought their suit against Thompson and others, who were in possession of the land under the judgment of the District Court. And the court held, that the judgment of the District Court did not bind the plaintiffs in this suit in their capacity as heirs of Mrs. Holder.

The counsel of the defendant nevertheless thrust upon the attention of the court two questions, touching the right of the surviving husband to sell community property, upon which the court, *ex gratia,* expressed its opinion, though, evidently, they were of no practical importance, in view of its ruling as to the effect of the judgment under which the defendants claimed. But neither of these questions has the slightest bearing upon the propositions which we are endeavoring to enforce. The first is, that the sale of the land by the surviving husband was necessary for the support of the children. The support of the children is certainly not a charge upon the community estate. The fact that the purchaser makes the assumption as the source from which he gets his title, plainly shows that he was not an innocent purchaser. On the second point, the court delivered a most learned and ex-

haustive opinion; and though it is, without doubt, the point
to which those who cite this case in support of the conclusion
which I am combating, it plainly has no bearing upon them.

The proposition which the learned judge discusses, is that
asserted by the Supreme Court of California in the case of
Panaud *v.* Jones, 1 Cal., 488, to wit, that the surviving hus-
band has the same absolute control and disposition of the
community property after as he has before the death of his
wife; that the rights of the children of the marriage do not
attach to any part of the ganancials until the death of the
father; that, notwithstanding the death of the wife, the sur-
viving father may dispose of community property for any
honest purpose, so there is no intention to defraud the chil-
dren. And he may, says Panaud *v.* Jones, by last will and tes-
tament, direct the sale of community property for the payment
of his own debts. That these were the questions upon which
this court joined issue with that of California, is too obvious,
from reading their opinions, for comment. No question of
this kind is now before us. I do not insist that the surviv-
ing husband has any absolute right to dispose of community
property after the death of the wife. I merely claim for him
power to do so for certain recognized and legitimate purposes.
If he has the absolute right of disposal, the purchaser will get
a good title, although he knew when buying that the husband
was not selling for the purpose of discharging community lia-
bilities. If, however, he has a mere power to sell for certain
legitimate purposes, if the purchaser knows the property is
being sold for some other purpose, he gets no title. The point
of difference between myself and the court, is not in regard to
the right of the survivor to sell, but whether the innocent
purchaser, or the heirs of the wife, must suffer in consequence
of his wrongful sale.

Mitchell *v.* Marr, 26 Tex., 329, rules property conveyed
by bond or deed is, unless a contrary intention is shown,
community property. About this there can be no contro-
versy. There·is nothing said in the opinion in regard to the

character of the title which the community acquired by such deed. There was no necessity to draw the distinction between legal and equitable titles. The most that is said by the court, relates to the issue whether the property was community property, or the separate property of the wife. I quote the remaining section, viz.: "It is insisted, by appellant, that he is entitled to the protection of a *bona-fide* purchaser, without notice of the title of the plaintiffs. This point was made by counsel in the case of Wilkinson *v.* Wilkinson, 20 Tex., 241, but was not noticed in the opinion of the court, or sustained by the judgment. If the doctrine can be invoked in any case to defeat the title of the heir, whose right to his ancestor's estate, not being evidenced by writing, is not susceptible of registration, it cannot avail the appellant in this case. There is no evidence that he paid the purchase-money. (23 Tex., 443.) Moreover, his deed recites the bond for title pursuant to which it was made, which was recorded, and which discloses that at its date the vendor, Mrs. Simpson, was a married woman, the wife of John S. Simpson, whose estate the plaintiff claims. The defendant is thus affected with notice of plaintiff's title."

It plainly appears, from what is here said, that the court did not decide, in Wilkinson *v.* Wilkinson, that the vendee of the surviving spouse would not be entitled to protection if he is a *bona-fide* purchaser. Nor is the question decided in this case. The most that can be said, is that the opinion intimates a doubt of the validity of such a defense; and that it suggests the only plausible ground to justify the doubt. Though not now considering this point, I will say, in reference to this suggestion, that it is not merely for want of notice of the heir's rights to his ancestor's estate, which he acquires by inheritance, and not by a written title, that makes this defense applicable, but that the record gives no notice of the title of the ancestor. On the contrary, it shows an absolute title, in most instances, in the purchaser's vendor.

The next case in order is that of Burleson *v.* Burleson, 28

Tex., 418. Evidently, the majority of the court do not regard this case as tending to support their views. The court says, in respect to the questions here involved: " On examination, it will be found it is only an opinion expressed, and not an authoritative decision of them." I trust I will be pardoned, if I venture to express the conviction that a careful examination of it, in connection with the other case under review, will demonstrate that there was as ample warrant for the opinion expressed in it, as there was to call for the decisions in the cases which, it is insisted, have conclusively decided this question contrary to what is there held, if in any of them it has really been so decided. Having been a member of the court at the time the case of Burleson *v.* Burleson was decided, and feeling myself as fully responsible for every sentiment and word expressed in it as the lamented judge by whom the opinion was delivered, I shall leave its vindication from the criticism, if any is needed, of being, in the particular in question, *dicta* to other hands. I make no comment upon it, for the further reason, that the court seemingly regard it as applicable only where the community or its head held only an equitable title to the property for which the heirs of the wife sue. That is not this case. And I have no intention, on the present occasion, of going into a discussion of questions which arise in such cases.

In regard to the two remaining cases, Walker *v.* Howard, 34 Tex., 478, and Magee *v.* Rice, 37 Tex., 500, it will suffice to say, that they add nothing to the case to which I have referred at such length. No particular importance seems to be attached to them by the court. If, as intimated, the court by whom they were decided was led, to some extent, into error by Burleson *v.* Burleson in the first case, this was corrected in the last.

Other and later cases could be cited. But as they have not been referred to by the court, I will not consume time by adverting to them. If I were to do so, they would probably throw no additional light upon the subject of discussion. As

tending, however, to do this, and to exhibit the view taken of the right of the surviving husband as regards the community estate in the States having laws most nearly analogous to ours, reference may be had to the following cases: Scott *v.* Ward, 13 Cal., 470; Noe *v.* Card, 14 Cal., 577; Van Maren *v.* Johnson, 15 Cal., 308; Packard *v.* Arellanes, 17 Cal., 525; Guidry *v.* Davis, 6 Ann., 90; Guice *v.* Lawrence, 2 Ann., 226; Broussard *v.* Bernard, 7 La., 216.

Nor do I deem it necessary to comment upon the act of March 13, 1848, defining the marital right of parties, or the supplementary act of August 26, 1856. As these acts have been held by the court not to throw restrictions around the surviving husband, but, on the contrary, to enlarge his powers, (Dawson *v.* Holt, 44 Tex., 174; Lumpkin *v.* Murrel, 46 Tex., 51,) if the statute is complied with, the husband will have the same right to manage, control, and dispose of the community property, after his wife's death, as he had during her life.

Having gone through the cases cited and relied upon by the court, I ask, with all due respect, in which of them have the points upon which we differ· been decided? In what case, by any just rule of construction, can it be said that the question, whether the wife acquires, by reason of the law of community, the legal title by a deed to the husband, has been presented in the record, argued by counsel, or considered and decided by the court? It has, unquestionably, been repeatedly held, that the surviving husband has power to settle up the community, adjust and discharge its liabilities. His power to sell property, to pay valid claims against it, is fully recognized in this case, and in Johnson *v.* Harrison. But when and where has it been said that the purchaser must be prepared to sustain his title by proof that there were such debts, and that the sale was made to pay them, and that the vendor acted in good faith and within the scope of his authority? Which of these cases determines that a purchaser in good faith, for a valuable consideration, from one holding

the legal title, or the apparent legal title, with no knowledge
or opportunity of learning that any other persons claim an
interest in the land, is not entitled to protection against the
heirs of the wife, whether they are adults or minors ?

But if they have been decided, were these decisions made
on solemn argument and deliberation ?   And are they of
such a character as this court should, without question, ob-
serve and follow them ?   I trust I properly realize the im-
portance, in the practical affairs of life, of the doctrine of
*stare decisis.*   I certainly would not lightly disturb a line of
decisions, or even a single well-considered case, which has
become a rule of property.   But if it is the duty of this
court to follow precedents and observe and respect decisions,
it is frequently equally necessary to examine them without
fear, and revise them without reluctance.   (1 Kent's Comm.,
477.)

If the cases referred to have gone to the extent thought by
the court, they have not, and from their very nature never
can, become a rule of property, but must continue, so long
as the court is controlled by them, to unsettle it.   They will
be a source of continued disturbance of society, and lead
to the stirring up of strife and litigation, over stale and
often long-forgotten transactions, after the parties by whom
they should have been settled have passed away, and after
the property involved has passed through many different
hands, who know nothing of the facts and circumstances
connected with them, and who have no opportunity of
learning the truth in relation to them.   They can but be
fountains of fraud and perjury, poisoning the minds of
children, inculcating lessons of selfish distrust and disre-
spect, in place of reverence, filial affection, and domestic
harmony.   Such a train of decisions, when fully approved by
this court, must cast a cloud on almost every title to land in
the State, and, when generally known, reduce the value of
real estate, embarrass its transfer, obstruct settlement, retard
improvement, drive away emigration, alarm capital, and

produce general uneasiness and disquiet, with all the attendant evil consequences resulting where men are made to feel insecure in their property and homes. That such must be their general effect, cannot be controverted. With the most diligent inquiry and examination that is practicably possible, the most patient attorney, when called upon to examine a title, will be unable to say, in one instance out of ten, that it is unquestionably perfect, or advise a client that he may purchase without danger that he may not at any moment find himself involved in a suit for one-half the land, with people of whom he has never heard, though he has the very title in his hand which, the court will hold, gives the parties suing him the legal title to half the land. It is practically impossible, by any reasonable inquiry, for the most prudent purchaser to learn the domestic relations of every party through whom land has passed. If possible, it would be quite difficult to do this, if all such parties resided in the immediate vicinity of the land. But when it is remembered that many of them may have lived in widely different localities, it evidently would be a vain undertaking. And what prudent man would buy land, if he knew that he could be called upon, at any time during the next twenty or thirty years, if any one of the parties through whom his title comes was married when he purchased, but a widower when he sold it, to show that there were debts against the community estate of such vendor and his former wife when he sold the land; that such sale was made with the honest purpose of paying these debts, and that the vendor had justly accounted to his and his deceased wife's children for all their interest in the community estate?

Such suits as these have certainly never been regarded with any peculiar favor by the courts, and are not to be encouraged. They have, indeed, been reprobated in the strongest terms in this and other courts. (See Stramler *v.* Coe, 15 Tex., 211; Caldwell *v.* Hennen, 5 Rob., (La.,) 26.) Much too often there is found in the record strong ground for suspect-

ing that the heirs of the wife are used by others as instrumentalities in branding their father with fraud, to enable such parties to make an iniquitous and unconscionable speculation out of a party who has been entrapped into the purchase of a defective title. The record in this case exhibits strong suspicion that such is the character and object of this suit. I have not time to comment upon the facts; but the statement by the reporter will no doubt set them out sufficiently full for this phase of the case to be properly understood and appreciated. On the other hand, innocent purchasers, as appellant, David Yancy, Sr., was unquestionably proved to be, have always been regarded as favorites by courts of equity. So much so, that as far back as the time of Lord Keeper Finch, it was said the precedents from very ancient times were that the court would not give assistance against a purchaser, "either to an heir, or to a widow, or to the fatherless, or to creditors, or even to one purchaser against another." (2 Lead. Cases in Eq., 3.)

It certainly cannot be questioned, if the court is to be governed by general principles, which, undoubtedly, are as applicable to such cases as any others, that if the defendant was a *bona-fide* purchaser, and held the legal title, the judgment is erroneous. It is equally clear, that if the legal title remained in Grigg till the date of sale to Yancy, that it passed by his deed to Yancy. Nor will it be denied, that the deed to Grigg was sufficient upon its face to vest the legal title in him. What, then, prevented its doing so? Or if it vested in him, how was it divested out of him before he did so by his deed to Yancy? Does the law creating the community property have this effect? I do not see why it should be so held. I find no such provision in the law itself. If it is so, it must be a mere consequence or result from the doctrine of community. Why should it be thought to have this effect? No doubt, though the legal title be in the husband, the equitable right of the wife is precisely the same as if the deed had been made jointly to her and the husband. And

so are those of her heirs, on her death, unless the husband sell to an innocent purchaser. That the law of community makes the wife equally in interest in the community with the husband, does not require that she should have the legal title; no more than the contract of partnership requires the legal title to land to vest in each member of the firm, in order to make them equally interested in it. Evidently, this is not the case. To so hold, it seems to me, is virtually to abolish our common-law forms of conveyances, and to confound the distinction between legal and equity titles, and to destroy, in a great degree, our registration system.

But if I am mistaken in this, it cannot be denied that the vendee named in the deed has the apparent legal title. If so, should not a court of equity protect an innocent purchaser from him, just as readily as if he held, in fact, the legal title? As there was nothing on record or elsewhere to put the purchaser on notice of the title of the heirs, the case is not similar to that of the heirs of a party holding the land by deed. True, the title of the heir in such case may not be registered, yet the party in whom the record shows the title being dead, a subsequent purchaser cannot be deceived. Here the party to whom the conveyance was made still holds the deed, and sells the land. Should not equity, under these circumstances, aid a *bona-fide* purchaser against the heir, not of the party to whom the land was conveyed, but the heir of another party, whose interest is not shown by the record or suggested by the chain of title exhibited to the purchaser? I submit that it should, or our laws for the registration of deeds serve merely to ensnare those relying upon them. If the heirs of the wife have the legal title, (which I cannot admit, because neither she nor they are named in the deed,) it would be a fraud, under such circumstances, to allow them to take the land from the purchaser, without refunding to him the purchase-money which he paid their father for it. (Bassett *v.* Nosworthy, English and American Notes, 2 Lead. Cases in Eq., 1.) But for our statute concerning conveyances,

6

only a life estate would pass by a deed to the grantee, and not to the grantee and his heirs. Then surely it requires an equally clear and statutory provision, before it can be said that a similar deed will vest the legal title in the grantee and his heirs, and also in his wife and her heirs; and this where there is nothing in the deed to indicate that the grantee was a married man at the date of its execution.

But suppose that both of these propositions are fallacious, still the case should have been reversed. It is not denied that the surviving husband, whether he had the title or not, may sell community property, after the death of the wife, to pay debts. He has a general power to settle up and adjust the community estate. A purchaser cannot possibly know what debts exist against the community. The only source to which he could apply for information is the husband himself. Now, it is well settled, that where a trustee has authority to sell for the payment of debts generally, an innocent purchaser is not to suffer through abuse of his trust, by selling when it is unnecessary; nor though he makes an improper appropriation of the purchase-money.

"In the case," says Justice Story, "of sales for the payment of debts generally, the purchaser is not only not bound to look to the application of the purchase-money, but if more of the estate is sold than is sufficient for the purpose of the trust, it will not be to his prejudice." (2 Story's Eq. Jur., sec. 1131; Perry on Trusts, sec. 795; Elliot *v.* Merryman, 1 Lead. Cases in Eq., 40.)

The court below should have allowed appellants pay for their improvement, if the lands could not be fairly partitioned so that all the improvements would fall upon the share allotted to them. It was so held in two of the cases previously cited. (Robinson *v.* McDonald, 11 Tex., 390; Thompson *v.* Cragg, 24 Tex., 600.)